FREDERICK SEIFTER, as Administrator of PINCUS SEIFTER, Deceased, Respondent, *v.* THE BROOKLYN HEIGHTS RAILROAD COMPANY, Appellant.

NEGLIGENCE — PROXIMATE CAUSE. A fractured ankle bone which did not perforate the skin cannot be regarded as the proximate cause of a death occurring over four months after the injury, the immediate cause of which death was septic pneumonia, claimed to have resulted from swellings on the thigh, middle thigh and groin, which in turn were produced by a septic condition of the bone following the injury, when there is not only no evidence of a diseased condition at the point of fracture at any time prior to the appearance of the swellings but there is positive proof that over two months after the injury the bone had united, was in good condition and presented no indication of degeneration or of sepsis; and in an action for negligence the opinions of experts based upon hypothetical questions which incorrectly assumed a septic condition at the point of fracture prior to the swellings, to the effect that the injury was the cause of the septic pneumonia, are not sufficient to support a verdict against the defendant awarding damages for the resulting death.

*Seifter* v. *Brooklyn Heights R. R. Co.*, 55 App. Div. 10, reversed.

(Argued November 14, 1901; decided December 31, 1901.)

APPEAL from a judgment of the Appellate Division of the Supreme Court in the second judicial department, entered November 26, 1900, affirming a judgment in favor of plaintiff entered upon a verdict and an order denying a motion for a new trial.

The nature of the action and the facts, so far as material, are stated in the opinion.

*Isaac R. Oeland* and *John L. Wells* for appellant. The court erred in refusing to dismiss the complaint upon defendant's motion, made upon the ground that there is no proof of unbroken connection between any wrongful act of the defendant and the death of the plaintiff's intestate. (*Pollett* v. *Long*, 56 N. Y. 206; *Ehrgott* v. *Mayor, etc.*, 96 N. Y. 281; *Hoffman* v. *King*, 160 N. Y. 619; *Lyons* v. *S. A. R. R. Co.*, 89 N. Y. 374; *Ginna* v. *S. A. R. R. Co.*, 8 Hun, 494; *Turner* v. *N. E. R. R. Co.*, 41 App. Div. 213; *Hurley*

v. *N. Y. & B. B. Co.*, 13 App. Div. 167; *Purcell* v. *Lauer*, 14 App. Div. 33; *Pauley* v. *S. G. & L. Co.*, 131 N. Y. 99; *Bond* v. *Smith*, 113 N. Y. 385.) The motions to dismiss should have been granted upon the ground that the plaintiff had failed to prove that his intestate was free from contributory negligence. (*Wiwirowski* v. *L. S. & M. S. R. R. Co.*, 124 N. Y. 420; *Galvin* v. *Mayor, etc.*, 112 N. Y. 223; *Ruppert* v. *B. H. R. R. Co.*, 154 N. Y. 90; *Chapman* v. *E. Ry. Co.*, 55 N. Y. 579; *Phillips* v. *N. Y. C. & H. R. R. R. Co.*, 127 N. Y. 657; *Bossert* v. *N. E. R. R. Co.*, 40 App. Div. 144; *Quinn* v. *B. C. R. R. Co.*, 40 App. Div. 608; *Schilling* v. *M. S. R. Co.*, 47 App. Div. 500; *Adolph* v. *C. P., N. & E. R. R. R. Co.*, 76 N. Y. 530; *McClain* v. *B. C. R. R. Co.*, 116 N. Y. 465.) The court erred in admitting evidence. (*Leeds* v. *M. G. L. Co.*, 90 N. Y. 29; *Kleiner* v. *T. A. R. R. Co.*, 162 N. Y. 193; *Evins* v. *M. S. R. R. Co.*, 47 App. Div. 511; *Taylor* v. *Town of Monroe*, 43 Conn. 36; *Tomlinson* v. *Town of Derby*, 43 Conn. 562; *People* v. *Roberts*, 159 N. Y. 70; *Read* v. *B. H. R. R. Co.*, 32 App. Div. 503; *Blate* v. *T. A. R. R. Co.*, 29 App. Div. 388.)

*James C. Cropsey* for respondent. There was an unbroken connection between the fracture and the death of Mr. Seifter. (*Hurley* v. *B. H. R. R. Co.*, 13 App. Div. 167; *Weber* v. *T. A. R. R. Co.*, 12 App. Div. 512; *Turner* v. *N. E. R. R. Co.*, 41 App. Div. 213; *Ginna* v. *S. A. R. R. Co.*, 8 Hun, 494; *Tait* v. *B. Ry. Co.*, 55 App. Div. 507; *B. R. R. Co.* v. *Kemp*, 61 Md. 74; *Dickson* v. *Hollister*, 123 Penn. St. 421; *Quackenbush* v. *C. & N. W. R. R. Co.*, 73 Iowa, 458; *Lyons* v. *S. A. R. R. Co.*, 89 Hun, 374; *T. H. R. R. Co.* v. *Buck*, 96 Ind. 346.) The question of the contributory negligence of the deceased was properly submitted to the jury. (*Pruey* v. *N. Y. C. & H. R. R. R. Co.*, 41 App. Div. 162; *Smedis* v. *B. & R. B. R. R. Co.*, 88 N. Y. 19; *Wieland* v. *D. & H. C. Co.*, 30 App. Div. 85; *Devine* v. *B. H. R. R. Co.*, 34 App. Div. 248; *Bossert* v. *N. E. R. R. Co.*, 40 App. Div. 144; *Warren* v. *U. Ry. Co.*, 46

App. Div. 517; *Fishbach* v. *S. Ry. Co.*, 11 App. Div. 152; *Rooks* v. *H., W. S. & P. F. R. R. Co.*, 10 App. Div. 98; *Fleckenstein* v. *D. D., etc., R. R. Co.*, 105 N. Y. 655; *Schafer* v. *Mayor, etc.*, 154 N. Y. 472.) The opinions of Dr. Moitrier and Dr. Jeffrey were properly received, and the exceptions taken thereto present no error. (*Stouter* v. *Manhattan R. R. Co.*, 127 N. Y. 661; *Turner* v. *City of Newburgh*, 109 N. Y. 301; *Matteson* v. *N. Y. C. R. R. Co.*, 35 N. Y. 487; 1 Greenl. on Ev. § 440; *Maher* v. *N. Y. C. R. R. Co.*, 20 App. Div. 161; *McClain* v. *B. C. R. R. Co.*, 116 N. Y. 459; *Hall* v. *Crouse*, 13 Hun, 557, 562; *Cannon* v. *B. C. R. R. Co.*, 9 Misc. Rep. 282; 149 N. Y. 615; *Harnett* v. *Garvey*, 66 N. Y. 641; *Stearns* v. *Field*, 90 N. Y. 641.) The evidence received upon the question of damages was properly admitted. (Code Civ. Pro. § 1904; *Houghkirk* v. *D. & H. C. Co.*, 92 N. Y. 219; *Quinn* v. *Moore*, 15 N. Y. 432; *Countryman* v. *F., J. & G. R. R. Co.*, 166 N. Y. 201; *Oldfield* v. *H. R. R. Co.*, 14 N. Y. 310; *Matter of Snedeker* v. *Snedeker*, 164 N. Y. 58; *O'Mara* v. *H. R. R. R. Co.*, 38 N. Y. 445; *Ihl* v. *F. S. St. Ry. Co.*, 47 N. Y. 317; *Lockwood* v. *N. Y., L. E. & W. R. R. Co.*, 98 N. Y. 523; *Bierbauer* v. *N. Y. C. & H. R. R. R. Co.*, 15 Hun, 559; 77 N. Y. 588.)

PARKER, Ch. J. The only serious question presented in this case is whether the guessing of medical experts, based upon inaccurate hypothetical questions, to the effect that a broken bone in the ankle, which did not perforate the skin, caused septic pneumonia four and one-half months afterwards, furnishes sufficient support for a verdict of a jury awarding damages against the negligent party for the resulting death. The question of the defendant's negligence will not be considered, for it can be said that there was some evidence in its support. Nor can there be any reasonable doubt of the proposition that the most favorable view of the evidence would justify the submission of the question to the jury whether the plaintiff was free from contributory negligence. But whether

there was evidence in the record authorizing the jury to find, as they necessarily did, that the injury which the plaintiff received was the proximate cause of his death four and a half months afterwards presents a very different question.

After the accident, which the jury have found to be due to a collision between one of the defendant's cars and the wagon of plaintiff's intestate upon which he was riding, the latter was taken to the hospital, where it was found that he had sustained a simple fracture of the left fibula, which means that the broken bone did not perforate the skin. Ambulance surgeon Dr. Love reduced the fracture and attended the patient until the arrival of the regular house surgeon, Dr. Schall, who thereafter continued the treatment. His stay at the hospital lasted about five weeks, during which time his weight was reduced from 260 to 210 pounds, and upon his return home his appetite was bad; he could not sleep, nor could he walk, except with the aid of crutches. About three weeks after his return to his home Dr. Schall called upon him and removed the plaster cast which had been about the injured limb, and made an examination of the fracture, which disclosed to him that the bone had united perfectly and that there remained the usual swelling and soreness incident to the presence of the plaster cast and nothing more. This was about the middle of February, and a little later a swelling on Mr. Seifter's thigh troubling him, the family sent for Dr. Love, who prescribed a liniment which being applied a few times, the swelling disappeared. From this time on until the twenty-first of April, no physician saw Seifter, but Mrs. Seifter testified that a few days after the first of February, when Dr. Love left, three lumps, each as large as two fingers doubled, appeared in the groin, and she also noticed that he had chills, and at the same time was warm and sweating. She testified that these chills continued right along, and that the lumps remained in the groin without change until his death on May second. The daughter also observed the presence of the lumps and believed that they remained until her father's death, although the family physi-

cian, Dr. Moitrier, who was called in on the twenty-fourth of April, failed to discover them. On the twenty-first of April Seifter had a very violent chill, and Dr. Glauvit, who lived near by, was called in and continued in charge of the patient until the family physician was called on April twenty-fourth. Dr. Glauvit was called to the witness stand, but there seemed to be no curiosity to find out what he knew about the patient, as no questions of that nature were put to him.

When Dr. Moitrier took charge of the patient, he diagnosed the case as acute croupous pneumonia. He continued to believe in that diagnosis and to treat his patient accordingly down to the day of his death on May 2nd, after which he prepared a death certificate in which he stated it to be his opinion that the cause of death was acute croupous pneumonia, a disease which no one pretends could have resulted from a fracture of the leg. Later, some one evolved the theory that if the pneumonia should be diagnosed as septic pneumonia, an opportunity would be presented for the expression of medical opinion to the effect that the death might have been an indirect result of the fracture. And it happened that the family physician (on more mature reflection, presumably) changed his mind as to the cause of the death of his patient, and testified upon the trial that in his judgment it was septic pneumonia, and another physician who saw the patient agreed with him. Physicians were called by the defendant, all of whom were of a contrary opinion, but it must be conceded that there was some evidence to show that Seifter died of septic pneumonia, and the jury having seen fit to believe that testimony, we shall in the further discussion of the case assume the fact to be established that the cause of death was septic pneumonia.

We are soon to inquire whether there is any evidence to support a finding of the jury that the fracture was the proximate cause of the septic pneumonia which resulted in death. But before its discussion it will be well to have in mind the rule upon that subject as it was last expressed by this court in *Laidlaw* v. *Sage* (158 N. Y. 73, 99): " A proximate cause is

one in which is involved the idea of necessity.  It is one the connection between which and the effect is *plain and intelligible;* it is one which can be used as a term by which a proposition can be demonstrated, that is, one which can be reasoned from conclusively.  A remote cause is one which is inconclusive in reasoning, because from it no certain conclusion can be legitimately drawn.  In other words, a remote cause is a cause the connection between which and the effect is *uncertain, vague or indeterminate.*  *  *  *  The proximate cause being given, the effect must follow.  But although the existence of the remote cause is necessary for the existence of the effect (for unless there has been a remote cause there can be no effect), still the existence of the remote cause does not necessarily imply the existence of the effect.  The remote cause being given, the effect may or may not follow."  Applying this rule, it will readily appear that the record contains no evidence whatever establishing that the fracture was the proximate cause of the septic pneumonia. When I say no evidence, I do not mean by that expression that none of the steps have such support in evidence that if the other steps were established there would be no evidence for the jury upon the general question, but instead that some of the links in the chain leading from the fracture to the disease which caused the death are without any evidence whatever in their support, and hence applying for the sake of clearness an oft-used figure of speech, as the chain is not stronger than its weakest link, it follows that there was no evidence for the jury upon the general question.

The plaintiff's theory is that there was a septic condition at the point of fracture, about the 21st of February, something more than two months after the injury, which was carried to the thigh where its further progress was obstructed with the result of inflammation at that point manifesting itself in swellings or lumps to which liniment was applied by the physician and in a week or more the inflammation and consequently the lumps disappeared, but reappeared in the groin a few days later, where they remained until a few days before Seifter's

death, when they disappeared, and as they did not break externally, it is presumed that they did internally, thereby discharging into the venous circulation, with the result that a piece of septic material was broken off and taken to the heart, and from thence to the lung where it lodged and caused the pneumonia of which Seifter died. It does not need the aid of medical experts to support the proposition that it was necessary for the plaintiff to offer evidence tending to establish infection at the point of fracture as the first link in the chain, but if it did, then it is furnished by the testimony of all the experts. Dr. Jeffrey, plaintiff's expert, said if there was no evidence of any infection at the point of fracture and no inflammation and no pus at that point, then it is impossible to attribute the inflammation either in this part of the thigh, in the middle thigh, or in the groin, to the fracture. Of the physicians called only one ever made any examination of the fracture after the plaster cast was removed. Dr. Schall, who treated Seifter at the hospital, after the first two weeks of his stay, and who subsequently removed the plaster cast, was asked this question: "At the time that you examined the fracture after taking off the plaster bandage was there any evidence there of degeneration or of a septic condition? A. There was not; most decidedly not." And further the witness testified: "I took off the plaster cast and examined the fracture. The fragments were approximated and united by the usual formation of callus; there was some swelling of the extremity, which is usual after the application of a dressing of that nature on account of the pressure on the circulation. With a man weighing from 250 or 260 pounds that would be quite apt to be the case. It is always so after all the cases in my experience. Q. In your opinion, Doctor, was there a complete and perfect union at the time of your examination of the leg? A. There was in my opinion, absolutely. This was a simple fracture; meaning by that, one in which the bone did not protrude through the skin at all, or communicate with the external air. There was no breaking of the outer skin in any way. I examined it

carefully. There was not at that time any symptom of infection at or near the point of union, absolutely none. The union takes place by the callus that is thrown out, forming a sort of natural splint. Eventually it becomes bony; it contains the bone cells which form the bones, which come later. Q. Is there any possibility of that material degenerating and becoming septic? A. There is no case on record, to my knowledge." No physician questioned Dr. Schall's testimony as to the nature of the injury or its condition when about the middle of February he removed the plaster cast. Only three other physicians were in a position to speak upon the subject at all. Of one of them no questions were asked, and the other two did not challenge or attempt to challenge Dr. Schall's statement as to the condition of the injury at the time of the removal of the cast. Dr. Love, the ambulance surgeon, seems to have been called in about the 21st of February on account of the lumps which had developed upon Seifter's thigh, but these lumps did not suggest to his mind at the time that they were occasioned by any possible inflammation at the point of fracture, for he did not even look at the fracture. To the question, when you examined Mr. Seifter on February 21st, did you examine the fracture, Dr. Love responded: "I don't recollect doing so; I don't think I did. I don't think the splint covered it. I did not examine it at that time to see whether it had entirely united or not."

Dr. Moitrier, the regular family physician, and Dr. Glauvit- who were called in after Seifter had been seized with pneumonia, saw nothing indicating inflammation at the points of union, for they omitted to give any testimony at all upon the subject. No other physicians examined Seifter while living, and if his family had an examination made after his death the fact is not disclosed.

Instead of meeting the burden of proof resting upon the plaintiff if he would establish a diseased condition at the fracture prior to the appearance of the swelling on the thigh, he did not even attempt it, while the defendant on the other

hand proved the negative by all the competent testimony apparently in existence. It is true that the plaintiff offered what his counsel thinks is "some evidence" tending in that direction. It may have tended in that direction, but it did not go far enough to reach the vital point made by Dr. Schall, that there was no disease at the point of fracture two months after the accident nor ever had been. Members of the family testified that his leg was swollen and red at the seat of the injury, but Dr. Schall said in effect: True, but no more so than is ordinarily the case where the fractured limb is for so long a time in a plaster cast — which statement he followed by stating the result of an actual examination made in order that he might discover whether the bone had united and was in good condition. The members of the family did not pretend that they made or were competent to make that test, and so they fail to offer any evidence upon the crucial point.

The plaintiff's superstructure of speculation and fact combined is, therefore, without any foundation to rest upon, and it must fall, thereby rendering it unnecessary to inquire whether it could stand if it had a respectable foundation, but it may be noted in passing that it is open to attack and that this is so may be suggested, at least, by calling attention to the evidence upon which the claim is rested, that the swelling in the groin broke internally. "A piece of septic material was broken off and carried through the veins into the heart, and from thence into the lung where it lodged, and gave rise to lung inflammation and pneumonia symptoms," is the claim made by plaintiff's counsel, and it is founded on the testimony of two members of the family that in March three lumps appeared in the groin about the size of two fingers doubled up which remained until after Seifter's death. Without the presence of this swelling, the theory of plaintiff's experts, based upon its internal rupture and the passing of septic material which it contained into the veins, thence to the heart and so on to the lungs, would have no foundation whatever. But if the testimony of the only witnesses who saw the lumps and who swore to their continuing presence until Seifter's

death is to be fully credited, the plaintiff, is equally unfortunate, for then there was no internal rupture with the claimed result that the poisonous material passed into the circulation. No physician saw these swellings in the groin, and Dr. Moitrier says he examined him on the 24th of April and continued to attend him down to the date of his death on May 2nd, and he testifies positively that there were no swellings in the groin at that time. So the triers of fact were asked to credit the witnesses who saw the lumps (which the physicians did not discover) down to the 21st of April, when Dr. Glauvit was called, and not to believe their testimony from that time down to the date of his death. For that period of time they were necessarily requested to believe Dr. Moitrier, and, therefore, to conclude that there were lumps which disappeared before the doctor saw them, which, if true, would tend to support the opinion expressed by an expert that the septic material in the groin might have passed into the circulation.

Our attention is called to the testimony of an expert (who never saw Seifter), from which selections are made, which, it is argued, convey the opinion of the expert that there was infectious material at the fracture, but I do not so read his testimony. He was plied with hypothetical questions assuming infection at the point of fracture, and all of his testimony tending to show how it was possible that the death might have resulted from the diseased condition of the fracture was based in the first instance upon the assumption that there was a septic condition there; an assumption not founded upon a personal investigation or upon evidence, but upon questions put by counsel for the plaintiff, which assumed to correctly state the facts established upon the trial. Now, as we have seen, those questions did not correctly state the facts, in that, among other things, they embraced a statement that there was infection at the point of fracture prior to and at the time of the appearance of the swelling upon the thigh.

But I shall not pursue this subject further, for it has already been made to appear that the most favorable view of the testimony contained in this record does not permit a finding that

the injury to Seifter was the proximate cause of his death. Death from pneumonia is not ordinarily the necessary and natural result of an injury to the fibula bone, and when, as in this case, it is sought to establish almost entirely by expert evidence that such result actually followed, the connection between cause and effect should be made so clear that the conclusion can be said to be the reasonable result of the proof. In this case the proof falls far below that standard, and the verdict of the jury is left to rest too largely upon conjecture and speculation, and so, I think, is not supported by evidence, and, hence, the verdict should not be allowed to stand.

The judgment should be reversed and a new trial granted, with costs to abide the event.

LANDON, J. (dissenting). On December 19, 1894, Pincus Seifter, the plaintiff's intestate, was riding and driving in a one-horse market wagon with a covered top, easterly on defendant's railroad tracks, on Myrtle avenue, in the borough of Brooklyn, when defendant's trolley car, also moving easterly upon the same tracks, came up from behind and struck the rear end of the wagon and threw Seifter out of the wagon, thereby causing a fracture of the fibula, or small bone of his left leg above his ankle. He received the ordinary treatment, but did not recover the use of his leg, and became greatly reduced in flesh and strength. He was in the hospital five weeks and then went home. In the latter part of April pneumonia developed, of which he died May 2, 1895, about four and a half months after the injury. The two principal questions upon the trial were, whether Seifter was free from contributory negligence, and whether the injury which he received upon the 19th of December, 1894, was the proximate cause of his death.

The defendant contends that there was no evidence for the jury upon the question whether the injury was the proximate cause of Seifter's death. In view of the want of unanimity in the affirmance by the Appellate Division, we are required by the exceptions to examine this question. There must be

some evidence fairly tending to support the verdict. (*Laid-law* v. *Sage*, 158 N. Y. 73.) The fracture was a simple one, making no outward rupture. When the patient came from the hospital, as both the physician and surgeon of the hospital testified, his leg at the point of fracture seemed to be doing well, and as his daughter testified, to be swelled, reddish like, and sore. He could not bear any weight upon it. Then about February 21, three weeks after he left the hospital, he had a swelling upon his thigh. Under treatment by the physician this disappeared in about a week. Shortly after three large lumps appeared in his groin, which were painful and inflamed. They remained until chills, symptoms of blood poisoning, appeared; then pneumonia followed and pus between the lung and chest wall; and then death about nine days after the pneumonia developed. The plaintiff undertook to prove that Seifter died of septic pneumonia, and there was evidence for the jury upon that question. The defendant contends that the evidence shows that he died of idiopathic or croupous pneumonia, but the verdict settles that question in favor of the plaintiff. Septic pneumonia seems to be produced by blood poisoning, while idiopathic pneumonia is not due to that cause. The plaintiff's theory is that the fracture of Seifter's leg produced septic poisoning, or such condition as did produce it; that the septic conditions produced the swelling in the thigh; afterwards the swelling in the groin; developing into septic poisoning which broke in the groin, passed upward to the lungs, and caused the septic pneumonia of which he died.

It is urged that the difficulty with this theory is that there is no evidence tending to show that septic conditions were produced by the fracture; that there is much evidence to the effect that the fracture was properly treated and was making fair progress toward recovery; that septic pneumonia may be caused by the inhalation of septic germs as well as by an unhealthy condition of the fracture; that the best that can be said of septic producing conditions at the fracture is, that instead of any testimony or opinion based upon any examina-

tion of the fracture, that they were there, they are supposed or conjectured to have been there, because the patient died of septic poisoning. Dr. Love, testifying in behalf of the plaintiff, said : Q. " In your judgment, was the inflammation in the thigh in your opinion connected with the fracture in the leg ? " A. " In my opinion it was; yes." Q. " And how was it connected with the fracture in the leg ? " A. " Because there must have been some cause for it, and there was no other cause ascertainable."

Other expert witnesses for the plaintiff upon hypothetical questions which embraced the facts as we have given them, testified that in their opinion the septic conditions resulting in death proceeded from the fracture as the point of origin. The substance of their evidence is that under the circumstances the fracture was the most probable of causes; that there must have been a cause, and the circumstances point to no other cause equally probable. We think this amounted to some evidence that the fracture was the cause. The fact that the fracture had not been examined with the view to find there sufficient symptoms to indicate this condition goes to the weight of the evidence, not to its utter absence.

We find the dead body of a man with what appears to be a bullet wound through his heart; we cannot find the bullet, or measure its exact caliber from the wound itself, but we find lying partly in the water near the dead body, a pistol bearing but indecisive indications of its recent discharge with a caliber somewhat approximating the size indicated by the wound. No witness heard or saw any discharge. No one can surely testify that it was ever loaded. Any other pistol or bullet slightly larger or smaller might have produced this wound, indeed it might possibly have been produced by some instrument other than a pistol, but there is no evidence that it was. We would agree that there was some evidence that the death wound was caused by this pistol. Now the evidence connecting the fracture with the patient's death is as equally direct. The doubt arises in both cases over the question whether either fracture or pistol was ever charged with

destructive matter, but in each case we find, not in the fracture or pistol, but in the body of the deceased, such traces or symptoms of it as tend to support the inference that it must have been so charged. And this, we take it, is a fair test; whether the conditions as proven tend to show that the cause alleged must have been the true cause, not necessarily to the exclusion of all other possible causes, but tending to the moral conviction that this and not another was the producing cause. This recognizes, but avoids the objection that where the evidence points as well to another cause as to the cause alleged, the latter is not sufficiently supported. (*Searles* v. *Manh. Ry. Co.*, 101 N. Y. 601; *Taylor* v. *City of Yonkers*, 105 N. Y. 209.) It removes the confusion of speculation and conjecture, and by at least its dust in the balance preponderates the scale in favor of the best supported contention. (*Pauley* v. *Steam Gauge & L. Co.*, 131 N. Y. 90, 99; *Bond* v. *Smith*, 113 N. Y. 378, 385.)

The verdict compels us to accept septic pneumonia as the cause of death. Let us assume that there are two causes of septic pneumonia, one, the inhalation of septic germs; the other, the paralyzed decaying matter on the edges of the fractured bone and in the bruised parts of its fleshy covering, or either, which the shocked vitality of the patient was unable to assimilate or cast out, and thus left it to fester and cause septic conditions — in other words, a blood poisoning mill. There is no evidence of the inhalation of septic germs, except such as it may be supposed all flesh is heir to, and generally thrives under; but there is evidence quite consistent with the establishment of the blood poisoning mill, very strongly confirmed by the accumulation of just the grist the mill would grind out. This seems to be evidence fairly tending to support the verdict, and not within reach of the rule as to conjecturing stated in *Laidlaw* v. *Sage* (*supra*). In that case it was clearly shown that Norcross' act was the proximate cause, and it was purely conjectural whether the defendant's act, if not excusable, co-operated with it. The alleged evidence of co-operation was that the two acts were nearly simultaneous,

and of course, without more, the plaintiff had no case. If there had been no explosion, and the plaintiff had left the defendant's grasp badly wounded, the case would bear some resemblance to the one before us.

The conclusion indicated is not without support in similar cases. (*Lyons* v. *Second Ave. R. R. Co.*, 89 Hun, 374; *Ginna* v. *Second Ave. R. R. Co.*, 8 Hun, 494; affirmed, 67 N. Y. 596; *Hurley* v. *N. Y. & Brooklyn Brewing Co.*, 13 App. Div. 167.)

Upon the question of contributory negligence, it appeared that Seifter's wife was riding with him and she looked twice to the rear without observing any approaching car, the last time within half a block of the place of collision.· It was in broad daylight, and the street was thronged with vehicles. The jury could find that Seifter was not negligent in relying upon his wife's vigilance, especially when his own care was in request in order to make progress forward. An exception was taken to the charge of the court in this respect. Seifter and his wife were riding in a wagon with a covered top. ·The court in speaking of the claim that Seifter was not in a position to make an observation of the approach of the car, said that "The law simply requires that he exercise the care and prudence that an ordinarily prudent person would exercise under the circumstances, having in view the danger that a reasonably prudent person would apprehend might occur in consequence of the position in which he was in the street, and in view of the frequency with which cars were operated along that line. ·Of course, if he could not have observed the approach of the car, then he was under no legal requirement to make the observation. The law did not impose upon him the duty of performing an act·which would be impossible. All that the law imposed upon him was to exercise the care that a prudent person would exercise, whether that would be to look or to listen or to take any other measures to ascertain the fact is left to the good sense and judgment of· the jury. The law has not pointed out that he shall look or that he shall listen, but simply provides that he shall do the thing that a

prudent person would do having regard for his own safety, in view of the dangers to be apprehended from the situation present."

Defendant's counsel said, " I wish to call your Honor's attention, by way of exception, to your statement in speaking of Mr. Seifter driving a wagon. Your Honor said that if he could not see the approach of the car, the law did not throw upon him the obligation—I except to that." Plaintiff's counsel then asked the court to charge upon that subject, " that the question for the jury is whether the deceased, by the use of reasonable diligence on his part, ought to have become cognizant of the approach of the car in time to have avoided the collision." To this the court responded : " Very well ; I will modify it in that way, although I think it is the same in substance." Counsel for the defendant excepted to this remark of the court, but whether to the modification suggested by the plaintiff's counsel in which the court acquiesced, or to that portion of the remark in which the court expressed the opinion that the charge " is the same in substance " as had already been charged does not appear.

The Appellate Division held that the exception was too loosely taken to be available. Passing that question, we think the charge as first made was intended to be the same in substance as the modified charge adopted by the court, and that the jury could not have supposed that it was an instruction that if the plaintiff, because of his wagon cover, could not look behind, he was under no obligation to do so. If there was any doubt of this, we think the language adopted by the court sufficed to remove it.

Other errors are assigned, but we do not think they call for reversal.

The judgment should be affirmed, with costs.

O'BRIEN, HAIGHT and MARTIN, JJ., concur with PARKER, Ch. J. ; BARTLETT and VANN, JJ., concur with LANDON, J.

Judgment reversed, etc.