## SMITH et al. v. PEJEPSCOT PAPER CO.

District Court, D. Maine, S. D.

Jan. 27, 1931.

Fred'k W. Hinckley, of Portland, Me., for plaintiffs.

N. W. Thompson, of Portland, Me., for defendant.

HALE, District Judge.

George B. Smith, Elliot Smith, and Frank Faulkins brought actions in the state court in Knox county, against the Pejepscot Paper Company, alleging damages to person and property, occasioned by the alleged negligence of the defendant company at Rockland, Me., in November, 1929. They assert that on the night of November 12, 1929, George B. Smith and his son brought their 39-foot fishing boat to the dock of the Snow Shipbuilding Company at Rockland and tied her up in front of the wharf; later the same night the captain and crew of the tug Pejepscot, owned by the defendant company, moved the plaintiff's boat from its position, where it had been left by the plaintiffs, up into the dock some 50 feet. At the place where the boat was originally tied up by the plaintiffs there was sufficient water to float her at any time. Later, at 3 o'clock on the following morning, plaintiffs went down to the boat and found her lying halfway up the wharf on her bilge; the water had gone out entirely and left the boat keeled over on her side. The agent of the defendant had moved the boat to this location without knowledge or consent of the plaintiffs; and the plaintiffs did not have such knowledge until the boat was found on her bilge. She was equipped with a gasoline engine and two gasoline tanks. The vents in the gasoline tanks were in the caps that screwed onto the tops of the tanks through which the tanks were filled; and it was necessary to have such vents in order to let air into the tanks. When the plaintiffs came back about 4 o'clock in the morning, the tide had come in sufficiently so that the boat was floating; and plaintiff George B. Smith went forward through the engine room to light the lights. He stood in the door between the engine room and forecastle and struck a match in the forecastle some six feet from the vent in the tank, for the purpose of lighting up. Immediately there was an explosion in the forecastle, and almost immediately another explosion in the after deck, causing damage to the boat by fire, and resulting in personal injury to the plaintiffs. For this injury to property and to the persons of the plaintiffs these actions are brought.

Later in January, 1930, the defendant, the Pejepscot Paper Company, filed a petition in this court to limit its liability to the value of its tug Pejepscot; and, in accordance with the practice in such proceedings, plaintiffs were enjoined from taking further action in the state court and ordered to file

their claims in this court. Thereupon the plaintiffs filed their claims here in these proceedings. This court therefore now has jurisdiction of the issues in the case.

The defendant, by its petition, contests its liability and the liability of the tug and her appurtenances for any and all losses or damage or injury occurring by reason of the matters set forth in these suits.

The petition raises, first, the question of liability. The claim of the defendant is substantially this: That the tug Pejepscot is a large ocean-going towboat. In the autumn of 1929 it needed a new rudder. Her master, Captain Hallowell, went to the I. L. Snow Shipyard in Rockland to have a new rudder made. The Snow Company was given a pattern of the rudder, and, when such rudder was completed, the tug was to come to the shipyard to have the rudder installed. When Captain Hallowell first went to the Snow Shipyard, he asked the superintendent where his tug could be berthed when she came for the purpose of installing the rudder. The superintendent went to the dock and pointed out the berth the tug was to use; it being the same berth the tug actually used at the time of the injury in question. At the time of meeting the officials of the Snow Shipyard, Captain Hallowell asked the superintendent what was to be done with the boats lying at this berth if there should be any there when he brought the tug in; and the superintendent instructed him to move them out of the way. The tug Pejepscot arrived at the Snow Shipyard late in the afternoon of November 11, 1929, and found several small boats there, including the boat belonging to the plaintiffs. Captain Hallowell then says that he went ashore and telephoned to Captain Snow, vice president of the yard, for instructions; and then Captain John Snow told him to move the boats out of the way. In accordance with this instruction, the crew of the tug took the lines that held the Smith boat into the dock and moved the boat up the dock some fifty or more feet, and made her fast. The same was done to all the boats that were there at that time. No harm came to any of those boats except the plaintiffs' boat, although they were all handled alike. On the following day the Pejepscot was towed out into deep water, where her old rudder was unhung and her new rudder hung, and on the night of November 12th, about 6 o'clock, after Snow's men had completed the hanging of the new rudder, the boat was taken back to the same berth she had been on the previous night; when the tug got back to the berth assigned to her by Snow, it was found that the Smith boat had been again moved into this berth; and the crew of the Pejepscot did precisely what they had done the previous night—they moved her up the dock and made her fast. The defendant alleges that the berth into which the Smith boat was moved was a soft level bottom used by the Snow Company for the purpose of grounding out boats; that no harm was liable to come to the boats and no harm did come to the Smith boat on the previous night, although she was handled in the same way. Defendant alleges that, about 3 o'clock on the morning of November 13th, when the Smiths went down to the wharf and found their boat high and dry, George B. Smith, one of the plaintiffs, lighted a match, without examination of the conditions existing, and caused the explosion.

The petitioner, defendant, makes the following contentions:

First, that the Smith boat had no right to lay in the berth in question. She was a trespasser, and this is especially true on the second night (November 12).

Second, that the damage complained of in this case would never have occurred if the boat had been properly equipped, and the gasoline tanks properly installed.

Third, that what did happen in this case was not the reasonable and probable result of the act of moving the boat.

Fourth, that the cause of the explosion was the lighting of a match in a cabin where gasoline fumes had been collecting for a long time, and the mixture of air and gasoline was just right to ignite.

Fifth, that the moving of the boat was not the proximate cause of the damage complained of.

Sixth, that, if there is any liability, it is the liability of the I. L. Snow Company, who directed the crew of the Pejepscot to move this boat so that they could perform their work on the boat.

The plaintiffs contend that, as a direct result of the negligent moving of their boat by the defendant, they suffered injury in person and in property, occasioned by the explosion of gas in the boat, after a match had been lighted by one of the plaintiffs. Clearly the boat was moved by the defendant from the position in which she had previously laid, and was moved to another berth. The boat grounded out and heeled over on her bilge. On the lighting of the match by one of the plaintiffs the explosion and injury occurred.

■ The first question before the court is: Was the alleged negligent act of the defendant the proximate cause of the injury. Here the burden of proof rests upon the plaintiffs.

■ The law is well settled that the proximate cause is the cause that, in and of itself, causes the damage, or starts in motion a train of events which, without the intervention of any other human agency, causes the injury. In Milwaukee & St. Paul Ry. Co. v. Kellogg, 94 U. S. 469, 474, 475, 24 L. Ed. 256, Judge Strong, speaking for the Supreme Court, stated the rule:

"The primary cause may be the proximate cause of a disaster, though it may operate through successive instruments, as an article at the end of a chain may be moved by a force applied to the other end, that force being the proximate cause of the movement, or as in the oft cited case of the squib thrown in the market place. Scott v. Shepherd (Squib Case), 2 W. Bl. 892. The question always is: was there an unbroken connection between the wrongful act and the injury, a continuous operation? Did the facts constitute a continuous succession of events, so linked together as to make a natural whole, or was there some new and independent cause intervening between the wrong and the injury? It is admitted that the rule is difficult of application. But it is generally held, that, in order to warrant a finding that negligence, or an act not amounting to wanton wrong, is the proximate cause of an injury, it must appear that the injury was the natural and probable consequence of the negligence or wrongful act, and that it ought to have been foreseen in the light of the attending circumstances."

In the Saucier Case, 122 Me. 325, 329, 119 A. 860, 862, the Supreme Court of Maine (Judge Spear, speaking for the court) gave the test for proximate cause:

"Proximate cause has generally been defined as the cause without which the accident would not have occurred. It has been defined in different jurisdictions as follows: 'The test of proximate cause is whether the facts constitute a continuous succession of events, so linked together that they become a natural whole, or whether the chain of events is so broken that ＊ ＊ ＊ the final result cannot be said to be the natural and probable consequence of the primary cause.' Quinlan v. City of Philadelphia, 205 Pa. 309, 54 A. 1026; Thomas v. Central R. Co. of N. J., 194 Pa. 511, 45 A. 344. 'The practical construction of a "proximate cause" has been said to be, one from which "a man of ordinary experience and sagacity could foresee that the result might probably ensue." ' City Counsel of Montgomery v. Wright, 72 Ala. 411, 47 Am. Rep. 422."

In Toledo, St. L. & W. R. Co. v. Kountz, 168 F. 832, 838, the Circuit Court of Appeals for the Sixth Circuit said:

"The proximate cause is the dominant cause from which the injury follows as a direct and immediate consequence; that an act prior in time is not necessarily the proximate cause of an injury, unless such injury was the natural and probable consequence of such act; and that such injury cannot be said to be the natural and probable consequence of the act when it was not one to be reasonably anticipated from it, and when it was one which could not have happened but for the intervention of a sufficient and independent cause operating between the first negligent act and the injury"—citing a long line of authorities.

In Teis v. Smuggler Mining Company, 158 F. 260, 264, 15 L. R. A. (N. S.) 893, the Circuit Court of Appeals in the 8th Circuit said:

"Whenever this causal connection between the negligent act and the ultimate injury is interrupted by reason of the interposition of some independent force or human agency, acting independently of the first negligent act, but for which the ultimate injury would not have come, the former is the remote and the latter is the proximate cause."

In Cole v. German Savings & Loan Society, 124 F. 113, 115, 63 L. R. A. 416, in speaking for the Circuit Court of Appeals for the Eighth Circuit, Judge Sanborn said:

"An injury that results from an act of negligence, but that could not have been foreseen or reasonably anticipated as its probable consequence, and that would not have resulted from it, had not the interposition of some new and independent cause interrupted the natural sequence of events, turned aside their course, and produced it, is not actionable. Such an act of negligence is the remote, and the independent intervening cause is the proximate, cause of the injury. A natural consequence of an act is the consequence which ordinarily follows it—the result which may be reasonably anticipated from it. A probable consequence is one that is more likely to follow its supposed cause than it is to fail to follow it"—citing a long line of authorities.

In Moody v. Gulf Refining Co., 142 Tenn. 280, 218 S. W. 817, 819, 8 A. L. R. 1243, the

facts showed that, while discharging gasoline from a platform, the gasoline was allowed to spill out, and, while it was lying on the ground, some boys came along and lit matches, causing the gasoline to catch on fire. The court held that the spilling of the gasoline was not the proximate cause of the fire. The court said:

"The correctness of the plaintiffs' contention depends upon two propositions:

"First. Was the fire which destroyed the property of the plaintiffs the result of the defendant's negligence?

"Second. Was that negligence the direct and proximate cause of the plaintiffs' losses, or were their losses the result of an independent, intervening cause which could not have been reasonably anticipated by the defendant? * * *

"It was held by this court in Southern R. Co. v. Pugh, 97 Tenn. 624, 37 S. W. 555, that negligence is the want of ordinary care and caution in doing an act, or it is the failure or omission to do what a person of ordinary prudence or caution would do under the circumstances, or it is failure to perform a duty required by law.

"In the case of Kreigh v. Westinghouse, C., K. & Co., 11 L. R. A. (N. S.) 684, 81 C. C. A. 338, 152 F. 120, it was said: 'Negligence is a breach of duty. Where there is no duty or no breach, there is no negligence. An injury that is the natural and probable consequence of an act of negligence is actionable. But an injury which could not have been foreseen nor reasonably anticipated as the probable result of an act or omission is not actionable; and such an act or omission is either remote cause or no cause whatever of the injury.' * * *

"But, even if it be conceded that the defendant was guilty of negligence in the manner in which it kept its premises and the manner in which it was unloading the gasoline in question, still we are of the opinion that such negligence was not the direct and proximate cause of the fire which destroyed the property of plaintiffs, but that said fire was the direct and proximate result of the independent intervening act of the boys in throwing lighted matches into the gasoline during the absence of defendant's employee, and that this act on the part of said boys was not such as could have been reasonably anticipated by defendant's employee."

In Salsedo v. Palmer, 278 F. 92, 94, 95, in speaking for the Circuit Court of Appeals for the Second Circuit, Judge Rogers said:

"To sustain an action for death, the wrongful act, neglect, or default must have been the proximate cause of the death. Scheffer v. Washington City Midland, etc., R. Co., 105 U. S. 249, 26 L. Ed. 1070; Mella v. Northern S. S. Co. [C. C.] 162 F. 499; Seifter v. Brooklyn Heights R. Co., 169 N. Y. 254, 62 N. E. 349.

"The maxim 'In jure non remota causa sed proxima spectatur' applies in such a case as the one now before the court. That maxim is thus paraphrased by Lord Bacon in his constantly cited gloss:

"'It were infinite for the law to consider the causes of causes, and their impulsions one of another; therefore it contenteth itself with the immediate cause, and judgeth of acts by that, without looking to any further degree.' Bac. Max. reg. 1.

"This is the first of Lord Bacon's maxims. Its meaning is that in ascertaining the cause of an injury in order to fix liability therefor one cannot go behind the last cause. The final cause and its immediate effect alone concern the court. Liability for result and responsibility for final cause are regarded as inseparable. * * *

"In Pollock on Torts (11th Ed.) p. 29, that distinguished authority declares that in such cases liability must be founded on an act which is the immediate cause of harm or of injury to a right. He asserts that for the purpose of civil liability those consequences, and those only, are deemed 'immediate,' 'proximate,' or 'natural and probable,' which a person of average competence and knowledge, being in the like case with the person whose conduct is complained of, and having the like opportunities of observation, might be expected to foresee as likely to follow upon such conduct.

"And Judge Cooley in his great work on Torts (3d Ed.) 99, treating of the right to recover in such cases declares that it is not only necessary that damage should be suffered but the damage must be 'the legitimate sequence of the things amiss.' He states that the maxim of the law here applicable is, that in law 'the immediate and not the remote cause of any event is regarded, and that the law always refers the injury to the proximate and not to the remote cause.'"

See, also, Chicago, St. Paul, M. & O. Ry. Co. v. Elliott (C. C. A.) 55 F. 949, 20 L. R. A. 582; The Mars (D. C.) 9 F.(2d) 183.

In the instant case, assuming, but not deciding, that the moving of the boat by the defendant was a negligent act, a charge of neg-

ligence against the defendant cannot be sustained unless the explosion which did the damage was the natural and probable outcome of moving the boat. Should the crew of the Pejepscot, even assuming that they were negligent in moving the boat, have expected or anticipated that an explosion would follow? George B. Smith says that he went down to his boat at about 3 o'clock on the morning of the injury and found her high and dry in the mud and lying off on her bilge. In cross-examination he says it did not occur to him at that time that there was anything wrong with the boat or that "any harm would be done to the boat by her heeling over," and that it did not occur to him that the gasoline was running out of her tanks.

It appears, then, that the owner and operator of the boat, a man familiar with the construction of the boat and of the gasoline tanks, would not, and did not, anticipate any trouble by having the boat ground out as it did.

There is further testimony by witnesses on the part of both parties that, if they had moved this boat, just as the crew of the Pejepscot moved her, and she had grounded out, it would not have occurred to them that the gasoline would have run out into her bilges or that any one would light a match and get the result which followed. The testimony shows that when Smith lighted the match he smelled fumes of gasoline. The experts in the case agree that gasoline fumes, when not dispelled by a draft of air, will accumulate over a long period of time; but, in order to have an explosion, the "mixture of gasoline and air must be just right."

There is clear and unchallenged testimony that, although the boat had grounded out in the mud, she had not heeled over as far as she would in a choppy sea. Snow testifies: "If she dumped gasoline with that list she would do it in her labors in rough weather at sea. * * * I wouldn't think she would lay over any worse than she would in an ordinary chop."

I cannot presume, from the testimony, that the defendant should have known that the gasoline would have run out of the tanks, and that George Smith would go into the cabin and light a match. There was not a clear unbroken chain of causation between the moving of the boat and the explosion.

The proofs show, I think, an intermediate and independent and efficient cause of the injury. I am constrained to hold that the proximate cause of the explosion was the lighting of the match by one of the plaintiffs in a room impregnated with gasoline fumes when the mixture of gasoline and air was in a condition to cause ignition.

In view of my conclusion, I do not decide whether or not the plaintiff has met the burden of showing by a preponderance of evidence that there was negligence on the part of the defendant; nor am I entering into a consideration of the further questions raised by either party.

A decree may be presented that the injuries, loss, and damage sustained by the plaintiffs were not incurred by fault on the part of the petitioner. The petitioner is not to recover costs against the plaintiffs.