St. Louis, Iron Mountain & Southern Railway Company
*v.* Steel.

Opinion delivered June 21, 1915.

1. MASTER AND SERVANT—INJURY TO SERVANT—NEGLIGENCE—DEATH DUE TO INTERVENING CAUSE.—Deceased was injured by the act of his employer, defendant railway company, while he was acting in the course of his employment; about a year thereafter, deceased contracted typhoid fever and died. *Held*, typhoid fever being the cause of deceased's death, the defendant could not be held liable therefor, even though deceased's physical condition had been weakened by the former injury.

2. MASTER AND SERVANT—DEATH OF SERVANT FROM INTERVENING CAUSE—DAMAGES FOR INJURY.—Under the facts above, there might be a recovery of the damages occasioned by the injury, up to the time of the death of deceased.

3. MASTER AND SERVANT—INJURY TO SERVANT—ABROGATION OF RULE.—An employee of defendant railway company was injured, while working under a freigth car, he having failed to set out the signal required by the company for his protection, showing that he was working there; *held*, the evidence did not show that the defendant had such knowledge of the violation of the rule as to amount to an abrogation thereof.

4. MASTER AND SERVANT—INJURY TO SERVANT—ABROGATION OF RULE.—Where a master makes a rule for the protection of its servants, and an employee was injured after having failed to observe said rule, nothing done by the master, tending to lead the servant to violate the rule, short of abrogation thereof, would render the master liable for a resulting injury.

Appeal from Saline Circuit Court; *W. H. Evans,* Judge; reversed.

This is a suit by the administrator of the estate of R. D. Steel, for damages to his estate and to his widow and children, for personal injuries to him, alleged to have been caused by the negligence of the railroad company, and to have produced his death.

The answer denied the allegations of the complaint and pleaded as defenses thereto assumed risk and contributory negligence on the part of deceased.

It appears from the testimony that R. D. Steel was in the employ of the railroad company as a car repairer in October, 1912, and while some switching was being done at Benton, was directed by the foreman of the repair gang, Sam McDonald, to repair some rods under certain cars that were in bad order, and while they were standing upon the passing track. He and Martin, the man working with him, went some 200 feet and got the rods and went under the cars to make the repairs, and before they had finished, another train switching, backed in on the track to couple on to the string of cars in which was the car being repaired. They shoved the cars down two or three car-lengths, moving slowly, at the rate of about a mile an hour. There was no blue flag put out by the car repairers as the rules of the company required, to indicate that men were at work upon the car, and to protect them against its being moved until the repairs were completed.

Lilburn Wright testified that he was present when the injury occurred, working on the dirt train; that he had come over from Bryant, unloaded a train load of dirt between there and Benton and was shoved in on the passing track; that the foreman of the repair gang, McDonald, told Steel and Martin to go under certain cars and repair the brake rods, or some other rods under them; that on account of the scarcity of cars, they did not switch them out of the train, and that they could put the rods on while they were putting other bad order cars on the repair track. "They

went and got the rods and brought them back, and Mr. Steel said something about the danger of going under the cars, so McDonald told Mr. Steel to go ahead and put the rods under there, and I will look after you; and, while this was being done, another engine came in from the back end and shoved these cars up some two or three car-lengths. At the time when the cars were being shoved, Steel was under the car, I presume. I saw him go under the car to put the rods under there and never paid any more attention until I heard somebody halloo. This attracted my attention, and I looked around and saw Martin giving a stop signal. About that time Steel came out from under the car, just about the time the car stopped. I can not recall just what Steel said when he came out, but he was making a howl at McDonald about not looking out for him. While this was going on, McDonald was right there with me, close enough to see this man and know what was going on, not more than twenty or thirty feet away. While Steel went under the car, he stayed right around there, and was in plain view all that time."

McDonald testified that he was car foreman for the railroad company at Benton; that Rhad Steel was working under him, had been for about forty-five days; that they were cutting down a grade at Bryant and the crew would bring over to Bryant a train of loaded cars, and the other crew would unload them. He discovered that a couple of cars had rods off of them and two others had the draw bars in bad order; and ordered the latter set on the repair track, and told Rhad Steel, the deceased, and Martin to put on the rods and where to get them, telling them first, "Don't ever go under a cut of cars without putting the blue flag out." He said he told the workmen this every morning, and they were given a card each day with the rule printed thereon as follows: "Examine personally scaffolding, tackle and all other appliances before trusting them. If your duties require you to go around, under or on cars, protect yourself with blue signals."

Witness said the repairers went under the cars without putting up the flag and the extra backed into the cut of cars on which they were working. He was standing by

"the cut of cars," and did not know they had been moved until he heard Martin call out, or laugh, and turned around and saw Rhad Steel lying upon the truss rods kicking. The cars moved a couple of car-lengths, when the train stopped, Rhad got out from under the car and came by and said, "I will see what right they have to butt in to a cut of cars I was working on." I did not know whether they had a flag up or not, but do know that if they had had a flag up, the cars would not have been moved.

It was the duty of the man at work repairing the car to put up the flag and the man who put it up, took it down, and no other had the right to remove the flag where a man was working. That the foreman could not take the flag down that was put up by a person working on a car, and there was sufficient space between the truss rods running lengthwise of the car and the bottom of the car for a man to lie upon them, and that was where Steel was when he saw him lying upon top of the rods; when the car stopped, he saw him get off of them. The cars were moved down slowly, and he could not have told they were being moved if his attention had not been attracted by Martin hollering or laughing, and turned and saw Rhad kicking down there while lying on the truss rods.

Witness stated he did not see Lilburn Wright around there at all and that he was twenty-five or thirty car-lengths away; that only he, Martin, and conductor Sheppard were present. Denied making any statement to Steel and Martin that he would protect or look out for them when they went under the car as testified by Wright, and that Steel had made any remark to him about it being dangerous to go under the cars; said it was not dangerous for him to go under the cars on the passing track after putting the flag out as the rules required.

He had seen some of the boys going to work without the flag, but had not seen Steel or others doing it along about that time; that if they did so, it was their own fault; that the flags were there in the office to be used, and that they were daily instructed and repeatedly told to use them as the rule directed when making

repairs. He said that Steel did not work long after the train bumped into the cars, that he came to where he was working on a car, about 2 or 3 o'clock, and was told to take a sledgehammer and knock the bolts out. He worked a while and knocked out one or two and claimed that his back hurt him, and quit work.

Martin, the repairer working with Steel, testified that they went to get the bottom rods to put on the cars, as directed by McDonald, the foreman; went two or three hundred feet away for them; that they did not put up the blue flag, although the rule required it done. He knew what the blue flag rule was and so did Rhad Steel; he knew it was his duty to put out the blue flag before he went under the car. ''I know he knew, because he was told many times, as I was, in my presence, by McDonald about it, and we also had work cards upon which the rule is printed. Rhad Steel saw the card and knew the rule, and Mr. McDonald did not give us any assurance, or make any statement that he would protect us, and that it was not necessary to put up a blue flag. I did not see Lillburn Wright anywhere around there. He was not with me, and Foreman McDonald and Rhad Steel when the foreman requested me and Rhad to go and get the materials and make these repairs. He was not with me or Foreman McDonald when I came back with the necessary materials to make the repairs. The cars were coupled in so easy at the time that if you had not seen them move, you would not have known it. They could not have possibly coupled any easier than they did. They moved the car about a mile an hour, I suppose—just barely moving them. They moved the car between two and three car-lengths. I did not know they had coupled into the cars until they began to move, and when I observed that they moved, I got out and gave them a stop signal, and they stopped. At this time Rhad Steel was on top of the rods. The truss rods that hold the center of a car.'' He said they forgot to put out the flag; that he did no think about it.

The conductor testified that he did not know any one was at work on the cars when he coupled on to them, and had moved the train about two car-lengths when he got

the signal to stop, and stopped immediately; that there was no blue flag displayed, and if there had been, they would not have coupled into the string of cars.

The testimony shows further that deceased went to his home after the occurrence that day; complained of his back hurting him; and from that time on he complained of suffering pains in his back, walked with a stick, and was not able to do any further work and his health continued to decline, and his appearance indicated suffering. That he had formerly indulged in and enjoyed riding horseback, but never rode again, and that he went about this way until some time in August, 1914, when he died from typhoid fever.

His widow testified that there was a bruised place on his back and side after he claimed to have been injured, but the only abrasion of the skin was a small place on the side of his head. That he complained continually afterward of pain in his back and in the following June took fever from which he never recovered.

The first doctor who attended him after the injury found him in bed, complaining of his back, but could discover no symptoms of an injury except he thought that possibly the right side of the muscles of the back were a little larger; that he could discover no bruises, and did not really know what was the matter; that he never detected any injury to his spine after giving him the usual examination therefor. He did not think he was suffering from any injury received on the 24th of October, that would have contributed to his death in August, the following year.

All the physicians testified that typhoid fever is a germ disease caused by a well known germ, and that an injury to the deceased, such as it was claimed he received in October, would not have contributed to his death with typhoid fever the following August; that there was no relation whatever between typhoid fever and the injury and the typhoid could not have resulted from the injury.

One of the physicians stated that his lowered vitality and weakened condition resulting from the injury, might have caused him to more easily become infected with the

typhoid germ and render it less likely that he would recover from the fever.

There was testimony relative to the earning capacity of the deceased, the amount he contributed to the support of his family, as well as to his exemplary habits and his solicitude for the welfare and training of his children, and also the testimony of some witnesses that they had frequently seen people at work about Benton for the railroad company without displaying blue flags.

The court instructed the jury, giving over oppellant's objections, instructions C, D and F, as follows:

C. Although you may find that deceased was guilty of contributory negligence in going under the car without posting a signal flag, yet if you further find from the evidence that defendant's foreman knew of said negligence, and was aware that deceased was in peril, and then failed to exercise ordinary care to prevent the accident, the defendant is liable, notwithstanding the contributory negligence of deceased.

D. You are instructed that decreased was not bound by any rule of defendant company which was not brought to his attention, or which was habitually violated with the knowledge of his superior officers, and without any effort upon their part to enforce it, if you find from the evidence that the rule was habitually violated with the knowledge of deceased's superior officer, and he made no effort to enforce it, or where the usage and practice of the defendant would tend to mislead him in the violation of the rule.

F. If you find by a preponderance of the testimony that the deceased was injured, and that prior to the injury he was sound and free from disease, and that by reason of the injury his health was impaired and broken down to such an extent as to render his system more susceptible to disease and less able to resist it, and if you further find that as a result of such impaired condition of his health, he contracted typhoid fever, and that death resulted from such disease, then you are instructed that you would be warranted in finding that his death is legally attributable to the accident.''

The jury returned a verdict in favor of the administrator and from the judgment the railway company brings this appeal.

*E. B. Kinsworthy, W. R. Donham* and *T. D. Crawford,* for appellant.

1.   It was error to give instructions C, D and F. There was no testimony that the blue flag rule was habitually violated with the foreman's knowledge. An occasional violation of a rule, or sporadic disobedience does not constitute an abrogation of a rule. The acts of servants who do what they know is prohibited, or fail to do what is prescribed, is negligence, and the proximate cause of the injury. 3 Labatt, M. & S., § 1139. Ordinarily, the question of proximate cause is for the jury. 104 Ark. 59.

2.   Decedent was engaged in interstate commerce. 178 Fed. 643. It was not necessary to plead the Federal statute. 229 U. S. 156.

3.   The defendant was liable for the injury to decedent's back, if due to its negligence; but not for his sufferings and death due to typhoid fever, unless that disease was proximately caused by the injury. 1 Thompson on Neg., § 70. Where a new and independent cause not under the control of a wrong-doer intervenes between the act and the injury, if such intervening cause is not a consequence of the original wrongful act and could not have been foreseen by the exercise of ordinary care, and but for such intervening cause the injury would not have happened then the latter is the proximate cause, and no recovery can be had. 1 White Personal Inj., § 25. It must appear that the injury was the natural and probable consequence of the negligence and ought to have been foreseen. 69 Ark. 402; 105 U. S. 249; 89 Ark. 58; 104 Ark. 59; 97 *Id.* 160; 229 U. S. 265; 20 Pa. St. 171; 194 *Id.* 24; 101 N. W. 795.   On the subject of proximate cause, see also, 57 Am. 602; 19 *Id.* 631; 30 So. 68; 124 Fed. 113; 63 L. R. A. 416; 105 U. S. 249; 125 N. Y. App. Div. 603; 169 N. Y. 254; 72 Atl. 979; 76 *Id.* 1088; 85 N. Y. App. Div. 370; 83 N. Y. Supp. 339; 72 *Id.* 544; 42 *Id.* 789; 153 Wisc. 637; 212 Mass.

262; 112 Va. 243; *Malvern Lbr. Co.* v. *Sweeny,* 116 Ark. 56.

*Bratton & Bratton* and *Garner Fraser,* for appellee.

1. The Federal act has no application and was not pleaded. There was no proof that defendant was engaged in interstate commerce. 299 U. S. 156; 115 Ark. 308. Courts do not take judicial knowledge as to whether or not appellant was engaged in interstate commerce. 84 Ark. 409; 100 N. E. 337; 69 Ind. 199; 28 Ind. 429.

2. Steel's death was traceable directly to his injuries. They were the proximate cause of his death. 81 Ark. 343; 98 *Id.* 362; 106 *Id.* 92; 1 Thompson on Negl., § § 56, 59, 153; 88 S. W. 466. As to intervening events, see 1 White Personal Inj., § § 24, 25; 88 (Tex.) S. W. 466; 125 N. Y. App. Div. 603. Any wrongful act causing injury from fire, water, *disease, * * *,* etc., under circumstances which render it probable that such injury will occur, is a *primary,* efficient and *proximate* cause if harm ensues. 1 Suth. on Dam., § 38, pp. 42-44; 96 Eng. Rep. 525; 89 N. E. 525; 12 Am. Negl. Rep., 234; 29 Cyc. 499, 500, 507; 13 Cyc. 30; 18 L. R. A. 220; 95 Ark. 297; 115 N. W. 168; 82 N. E. 362; 46 So. 737; 117 N. W. 37; 127 S. W. 820; 136 *Id.* 94; 87 Ark. 579.

3. In this cause *both* the accident and the disease combined to bring about the injury and death. 83 Ala. 377; 104 Ind. 432; 129 Mo. 590; 57 Tex. 83; 139 S. W. 59; 224 U. S. 577; 65 S. E. 848; 104 S. W. 1011; 118 *Id.* 78; 61 Md. 74; Cooley on Torts, p. 70; 49 Am. Rep. 168; 36 Fed. 167, and many others. One who by negligence injures another as a result of which their system is run down and vitality lowered is responsible for the consequences thereof. 212 Mass. 262; 108 Ark. 21; *Biddle* v. *Jacobs,* 116 Ark. 82, and cases *supra.*

4. Proximate cause is ordinarily a fact for the jury. 104 Ark. 59; 46 Ark. 182.

KIRBY, J., (after stating the facts). (1) It is contended that the court erred in giving each of said instructions, and especially in the giving of instruction numbered "F," telling the jury that if it found deceased was injured and his health was thereby impaired to such an ex-

tent as to render him more susceptible to disease and less able to resist it, and it further found "that as a result of such impaired condition of his health, he contracted typhoid fever, and death resulted therefrom, that it would be warranted in finding his death was legally attributable to the injury."

It is insisted that the railroad company could in no event be held liable in damages for the death of deceased, unless its negligence would have produced his death without the intervention of the typhoid fever, which it is claimed was not a natural and probable consequence of the injury.

Thompson says: "A person who, in the prosecution of a lawful act, is guilty of negligence which, combining with a subsequent circumstance of an extraordinary nature, produces an injury to a third person, will not be answerable for the damages unless his negligence would have produced the injury, had not the extraordinary circumstances supervened. The reason is that the law holds him liable for those consequences only which were the natural and probable results of his negligence, and which, therefore, ought to have been foreseen and anticipated."

"When a new, independent cause, not under the control of the alleged wrong-doer, intervenes between the alleged wrongful act and the injury, if such intervening cause is not a consequence of the original wrongful act, and could not have been foreseen by the exercise of ordinary care, and but for such intervening cause, the injury to the plaintiff would not have resulted, then the intervening cause will be taken to be the proximate cause of the injury, and no recovery can be had from the party who is not responsible for such independent cause." 1 White, Per. Inj., 25.

In *Railway Company* v. *Bragg*, 69 Ark. 405, the court said:

"It is a fundamental rule of law that, to recover damages on account of the unintentional negligence of another, it must appear that the injury was the natural and probable consequences thereof, and that it ought to have

been foreseen in the light of the attending circumstances.''

This rule was followed in *St. Louis, I. M. & S. Ry. Co.* v. *Buckner,* 89 Ark. 58; *Pulaski Gas Light Co.* v. *McClintock,* 97 Ark. 576; and *Helena Gas Co.* v. *Rogers,* 104 Ark. 59.

''The general rule is that a man is answerable for the consequences of a fault only so far as the same are natural or proximate, and as may on this account be foreseen by ordinary forecast, and not for those which arise from a conjunction of his fault with other circumstances of an extraordinary nature.'' *Morrison* v. *Davis,* 20 Pa. St. 171; see, also, *Milwaukee, etc., Ry.* v. *Kellogg,* 94 U. S. 476.

For other cases holding the person, guilty of the negligence causing the injury, not liable for death thereafter resulting from some other cause, not the natural and probable consequence thereof, or of which it was not the proximate cause, see *Roach* v. *Kelly,* 194 Pa. 24; *Scheffer* v. *Railroad Co.,* 105 U. S. 249; *Peoples Ry. Co.* v. *Baldwin,* 72 Atl. 979, 76 *Id.* 1088; *Seifter* v. *The Brooklyn Heights Rd. Co.,* 169 N. Y. 254; *Koch* v. *Zimmerman,* 83 N. Y. Supp. 339, 85 App. Div. 370; *Hoey* v. *Metropolitan St. Ry. Co.* 72 N. Y. Supp. 544; *Allison* v. *Fredericksburg,* 112 Va. 243.

All human bodies are subject to weakness, disease and death, and although it was doubtless true as one of the physicians testified, that the vitality of Steel was so lowered and his system so weakened by the suffering from the injury caused him by the negligence of the railroad company, that he was more susceptible to disease and less able to resist it than he otherwise might have been, still the verdict can not be sustained unless there was some testimony from which it could be reasonably inferred that his death was occasioned by germs or disease caused by the injury or resulting from it as the natural and probable consequence thereof.

The attending physician testified that his death was caused from typhoid fever almost a year after the injury, and all the physicians stated that typhoid fever could not

have been produced by the injury nor as an effect arising from it, that it was never of traumatic origin. So far as the law and facts are concerned, the railroad company, through whose negligence the jury found the injury occurred was no more responsible for his death by typhoid fever, and it was no more the natural and probable consequence of the injury than if deceased had died from having been shot with a gun while in the weakened condition caused by the injury.

His death following such a shock, that might not have resulted but for his lowered vitality and weakened condition, would have been no less proximately caused thereby than was his death by typhoid fever.

The possibility that he succumbed more readily to the disease causing death than he otherwise would but for the injury, is insufficient to support the verdict and the jury should not have been told that if death resulted from typhoid fever contracted because of impaired health occasioned by the injury, rendering his system more liable to the disease and less able to resist it, that it was legally attributable to the injury.

The question of proximate cause is one ordinarily for the jury, to be determined as a fact from the particular situation in view of the facts and circumstances surrounding it. *Pulaski Gas Co.* v. *McClintock, supra.*

It is insisted that *Memphis, Dallas & Gulf Rd. Co.* v. *Steel,* 108 Ark. 14, is an authority contrary to the doctrine above announced, but such is not the case. In that case it was disclosed that the person injured was already suffering from the disease, or that the disease itself followed as a probable consequence of the injury.

Cyc. says: "An intervening efficient cause is a new and independent force which breaks the causal connection between the original wrong and the injury. Such new force must be sufficient itself to stand as the cause of the injury * * * such intervening acts must have superseded the original act, or been itself responsible for the injury. 29 Cyc. 499-500; see also, *Helena Gas Co.* v. *Rogers, supra.*

(2)  The typhoid fever was an intermediate cause disconnected from the primary or original injury and self-operating which produced the death of deceased and the negligence of the railway company causing the injury was not the proximate cause thereof, and the court should have given appellant's nineteenth instruction, telling the jury it was not liable for his death.  This would by no means, however, prevent a recovery of the damages occasioned by the injury to the time of the death of deceased from the intervening cause.

Instruction C tells the jury, notwithstanding it might find the deceased guilty of contributory negligence in going under the car without posting a signal flag, that if it further found from the evidence that the foreman knew of the negligence, and was aware that deceased was in peril, and failed to exercise ordinary care to prevent the injury, it would be liable notwithstanding the contributory negligence of the deceased.

The instruction was not abstract as contended, there being some testimony tending to show that the foreman had directed the deceased to go under the car and make the repairs and also agreed to protect him while so doing, and knew he was so engaged at the time.

(3)  Instruction D should not have been given.

Unless the rule, known to the deceased, requiring the car repairers, and those going under and working about the cars to first post the blue signal flag for their protection was abrogated by a custom established of its habitual violation with the knowledge of the master, it was erroneous, and although there is some testimony from different witnesses tending to show that they had seen people at work about the yards at Benton, and had not seen any such signal flag posted there does not appear to have been such testimony of a continued violation of the rule known to and acquiesced in by the master, as would abrogate it. *St. Louis, I. M. & S. Ry. Co.* v. *Sharp,* 115 Ark. 308, 171 S. W. 97; *St. Louis, I. M. & S. Ry. Co.* v. *Wirbel,* 108 Ark. 437, and cases cited.

The last statement of said instruction that the deceased would not be bound by any rule of the defendant

company "where the usage and practice of the defendant would tend to mislead him in the violation of the rule" was erroneous and prejudicial in any event.

(4)   If the rule was abrogated by proof of a custom of its long continued violation with the knowledge and acquiescence of the master, the violation of it by the deceased would not prevent a recovery for the injury, but since the rule was made for his protection and known to him, any usage and practice of the defendant tending to mislead him in the violation of it, short of its abrogation, would not relieve from the consequence of his negligence in violating it nor excuse him therefor.

For the errors pointed out, the judgment is reversed and the cause remanded for a new trial.