### Cincinnati, New Orleans & Texas Pacific Railway Company v. Perkins' Administrator.

(Decided October 9, 1917.)

#### Appeal from McCreary Circuit Court.

Master and Servant—Negligence—Requisites of Actionable Negligence in Personal Injury Cases.—In a suit to recover damages for the death of a servant alleged to have been caused by the negligence of the master, there must be some evidence tending to show that the death of the servant was the proximate result of the alleged negligence. Where a servant's ankle was injured by the negligence of the master and some months thereafter his death was causd by consumption of the lungs, there should have been a verdict for the master in a suit to recover damages for the death of the servant, as the evidence failed to show that the consumption was produced by the injury.

JOHN GALVIN and TYE, SILER & GATLIFF for appellant.

JOHN W. RAWLINGS, ROBERT HARDING and JOHN W. SAMPSON for appellee.

OPINION OF THE COURT BY JUDGE CARROLL—Reversing.

Henry Perkins, while employed by the railway company in placing ties on a flat car as they were handed to him and his co-laborer by other employes standing on the ground, was injured when one or more ties rolled or fell from the top of the pile as they were being loaded. The accident happened on May 8, 1913, and he died on

March 18, 1914. Before his death suit to recover damages for the personal injury sustained was brought, and after his death that suit was dismissed, and later this suit was brought by his administrator to recover damages for his death, which it was charged was caused by the negligence of the company resulting in the injury that as alleged produced the death.

On a trial of the case, which was brought under the Federal Employers' Liability Act, there was a judgment for the administrator, and on this appeal by the railway company the chief ground urged for reversal is that the jury should have been instructed to find a verdict for it upon the ground that there was no evidence showing that the death of Henry Perkins was due to the injuries he received while loading cross-ties.

There is no dispute in the evidence that Perkins, at the time the injuries were received, was about 18 years old, and was a stout, healthy, vigorous young fellow weighing about 156 pounds, free from any symptoms of tuberculosis or other disease; nor is there any dispute that the direct cause of his death was tuberculosis of the lungs, or, as it is commonly called, consumption.

As the suit was brought to recover damages for his death, it necessarily follows that before a recovery could be had by his administrator there must have been sufficient evidence to show that his death was caused by the injuries received, and being of the opinion that the evidence wholly fails to show any connection between the injury and the cause of his death, we will set out quite fully the evidence upon this issue as it appears in the record.

As before stated, it is shown that Henry Perkins at the time he was injured was young, healthy and strong, having no appearance of disease, nor is there any evidence tending to show that the disease from which he died was hereditary.

What happened immediately after he was injured is disclosed in the following evidence:

Prince Perkins said that when he saw him immediately after the accident he was sitting down by the side of the car holding his leg, looking like he was trying to "ward off misery"; that he never heard him complain of his side being hurt.

Ben Worley saw him when he either jumped or was thrown from the car when the tie struck him, and said that he sat down by the side of the track, holding his

side and ankle part of the time, and complained about both hurting him; that his ankle looked like it was hurt pretty badly, and that his shoe was taken off and his ankle examined, but that his side was not examined.

Lige Worley said that he saw him about the time and after he struck the ground, and that he was complaining about his ankle and foot and was holding his ankle; that he never heard him complain about anything except his ankle.

S. A. Worley helped to carry him home and said he was complaining of his ankle and that after he got to the house he spoke about his side being hurt, and that the witness opened his shirt and looked at his side, but he was not asked, nor did he say, what he discovered or whether his side gave any appearance of being hurt.

His father, Sol Perkins, testified that when he was brought home he was hurt in his side and ankle; that after he was injured he was never well any more and was unable to do any work and gradually lost in weight; that he complained of his side and ankle hurting him; that his ankle was swollen a great deal.

It will be observed that although one or more witnesses testified as to the injury to his ankle and its appearance, no one of them saw any injury on his side. All that they say is that he complained of his side.

Dr. Godbey saw him soon after the accident, and he testifies that "I found a mashed ankle and bruised. I used some antiseptic and then applied a bandage. I think I was at his home once or twice—two or three times. He did not complain of any other injury to or on his body, and I did not treat him for any other injury. I went to see him two or three times at his home and I would meet up with him at the depot and about town and ask him how he was getting along. He recovered from the injury to his ankle so far as I know, and after he had recovered he told me he was ready to report back to work if I would give him a statement. That was several weeks after he was hurt. He was longer recovering than I thought he would be. I don't know how long he went on crutches—several days—and then I think he walked with a cane some. I didn't treat him for anything except his bruised ankle and don't know of any other person treating him at the same time that I was. I examined his ankle on the day he was hurt and again afterwards, and it was swollen. Q. Assuming it to be true that that swelling continued on up to the time he died,

wouldn't you then say, as a doctor, that he never had recovered from that injury? A. If the swelling was still there and it was swollen, I would say he had not recovered. Q. When you first went to see him and treated him for the mashed ankle, you say you put some antiseptic on it; what antiseptic? A. I don't recollect whether I painted it with iodine. I usually paint a wound, if the skin is broken, with iodine. Q. The purpose of using that antiseptic was to prevent blood poisoning? A. To prevent any infection. Q. Infection from an injury of that sort would set up tuberculosis of the bone? A. I do not know about that. Q. Don't you know the books teach it, and were you not trying to avoid that thing? A. I was not trying to avoid tuberculosis, but an infection of some of the pus germs. Q. Would the germs have the same effect on the bone? A. Yes, sir. Q. Would he not have what you doctors call tuberculosis of the bone from an injury of that sort? A. It is possible to have it; yes, sir. Q. And the first thing you do when you see a crushed bone of that sort, the first thing you do is to try to disinfect it by using an antiseptic? A. Yes, sir; where the skin is broken. Q. An infection of that sort may become so serious that it will develop into tuberculosis of the bone and require an amputation of the leg? A. No, it was not sufficient. Q. Didn't you say that the ankle was crushed? A. Only the soft part, no bone was crushed. Q. Would not the bones crush if three or four ties weighing two or three hundred pounds should fall or roll down on the ankle, wouldn't that necessarily crush the bones? Don't you mean by crushing the ankle that the bone was bruised? A. No, bones do not bruise. Q. That ankle is crushed, don't you mean to convey the idea that both the flesh and bone were injured then? A. No, sir; I would have said a fracture of the bone. Q. Could not a bone be bruised without being fractured? A. We speak of a bone as a hard part, and it don't bruise but fractures. Q. Can it be injured? A. Yes, it can be injured. Q. And then it can become infected? A. Yes, sir. Q. But you were trying to avoid that when you put this bandage on and that application, whatever it was, an antiseptic of some sort? A. No, sir. Q. You were trying to get the infection away from there by the antiseptic? A. Yes, sir. Q. How many times did you put the antiseptic on? A. I do not know. Q. Your recollection is not clear about that? A. No. Q. Assuming it to be true, at the time he received that injury, he was a strong,

robust, healthy young man, eighteen years of age, able to lift cross-ties and do work, and no ill health at any time, and four or five ties weighing from two to three hundred pounds tumbled in on him, and that ankle was crushed, and from that time on his health began to decrease, and he also felt the effects of it in his side, and from that time on his health began to go down, and it kept on going down and he finally died, wouldn't you, as a physician, attribute that death to the injury he had received? A. No, sir; I would not. Q. What cause would you assign for it if that was the only thing you knew about it? A. I do not know, unless I was treating him for something else.''

Dr. Gambling treated him two or three months previous to his death at his office, to which he came three or four times. He said that he was then in a very poor state of health, suffering from pulmonary tuberculosis, or consumption of the lungs; that he evidently had had this consumption for two months or more. "I could not tell how long it had been in the system, but he was in the second stage of tuberculosis when I treated him. I never heard him complain of anything else. Q. Doctor, you know what caused that tuberculosis of the lung in his case. A. No, sir; well, no. Q. In his case you do not know what caused it? A. No more than I do in any other case. Q. How many kinds of tuberculosis can a body be infected with before it takes the life? A. You may have it in the lungs after the bacillus tissue in there,——. Q. But how many kinds of tuberculosis can you have and in what parts of the body, without it touching your lungs? A. There is but one tuberculosis bacillus, and they may attack the body anywhere. Q. Can you have tuberculosis of the bone? A. Yes, sir. Q. Is tuberculosis a germ that it floating around in the air on the outside that gets into the body and develops into what you call tuberculosis? A. It is. Q. He first had a germ in his lung and it developed in the body? A. Tuberculosis is a little germ; it is one of the million germs we have. If you were to get about 250 of these little germs in a wad you could drop them through the eye of an ordinary needle. Q. I am talking about what you say this germ is? A. Yes, sir. Q. And what I want to ask you is, it develops after it gets into the body? A. Yes, after it gets into the body. Q. Does it float around in the air? A. Yes, sir. Q. Can it get into the lungs? A. Yes, sir. Q. If there is a crushed bone and ankle, can

it develop into that? A. If it should be carried through the blood it could be. Q. And then communicate itself to the whole body and finally land in the lungs? A. Yes, the bacillus lives in the blood; it thrives better in the lungs than anywhere else. Q. I am talking about where it gets into the bone. I understood you to say there is tuberculosis of the brain and tuberculosis of the bone? A. Yes, sir. Q. And you have seen frequent cases of tuberculosis of the bone, and the lungs not be affected at all? A. Yes, sir. Q. And you frequently saw the bone off to keep it from going into the lungs? A. Yes, sir. Q. Assuming it to be true that this boy had never had any tuberculosis of any kind at all, but was strong and vigorous and an athletic fellow, worked on the railroad every day in the open air, and cross-ties fell on him and crushed his ankle and injured his side, and from that time on his health began to fail, and failed on, and in nine months he died, and he became anemic, would you say you knew what caused his death, consumption in his lungs from that history, or would you attribute it to these injuries? A. In that particular case I did not hardly know what to attribute it to. I think tuberculosis follows pneumonia a great many times. Q. With that history in his case up to the time you saw him two months before he died, wouldn't that be the most reasonable and natural thing and conclusion for you, as a medical man, to reach, that it was due to the injury? A. We have those cases of tuberculosis; tubercular trouble may follow a weak anemic system, one that is not strong enough to throw off the germs of the tubercular bacillus, and in that case you may expect tuberculosis. But tuberculosis usually is carried in the blood on account of the oxygen being in the blood where it thrives most, as it may be carried to the weak points; it lives better in the lungs because of the more oxygen. Q. With that history as I have stated it to you of this boy, would not the natural conclusion you would come to as a doctor be that that trouble you found in his lungs was from previous injuries he had received? A. I don't know anything about the previous injury. Q. Assuming them to be as I have stated them to you, would you not necessarily, as a medical man, reach the conclusion that it was due to the injuries and ill health? A. I do not know enough about his condition to answer that positively.''

Dr. Owens said that Henry Perkins came to see him in the fall and winter of 1913 and consulted him about

the condition of his lungs; that at that time he had consumption of the lungs; that he did not know how long he had had it before he saw him; that he said he had been feeling that way for some time; that he did not find him suffering from anything else except consumption of the lungs, and that he treated him for that trouble. "Q. You can have tuberculosis in any part of the body? A. Yes, sir. Q. If there was any undeveloped consumptive tendency in the human body, an injury would develop it? A. That might be; the cause of the relationship exists only between the germ and the body involved. Q. Did this boy have tuberculosis of the bone? A. I do not know; I did not examine his foot."

Dr. Cain said he saw him three or four times in February, 1914, and found him suffering from consumption.

It will be readily seen from this evidence, which is all there is in the record on the subject, that if we should assume, as we do assume for the purposes of this decision, that the injury received by Perkins was caused by the negligence of the company, the evidence wholly fails to show, directly or by fair or reasonable inference, that his death from consumption was the result of this injury. And in this connection it should not be overlooked that the evidence that he suffered any injury on his side was very unsatisfactory. It consists entirely of statements made by Perkins at the time he fell from the car that his side hurt him and some similar declarations made thereafter to his father; but no person saw any injury on his side, nor did he mention to any of the doctors who treated him that his side had been injured in any way, except that he did say to one doctor shortly before his death, and when he was in the last stages of consumption, that his side hurt him. But none of the medical witnesses were able to say that the injury to his ankle produced the consumption from which he died or that his death was caused by the injuries received.

The law applicable to this case, as has been held in many cases with uniformity and consistency, is that there can be no recovery for negligence unless the injury complained of was the proximate result of the negligence, or, as applicable to the facts of this case, that the death of Perkins must have resulted from the injury he received. Thus it was said in Conway v. Louisville & Nashville R. R. Co., 135 Ky. 229:

"There is also a plain elementary principle of negligence law that to constitute actionable negligence there

must be a concurrence of two things: First, negligence; and, second, injury resulting as a proximate cause of it. It matters not how negligent a person may be, his negligence, unless the injuries complained of were the proximate result of it, will not authorize a recovery in damages." To the same effect are C., N. O. & T. P. Ry. Co. v. Zachary, 32 Ky. L. R. 678; Cooke Jellico Coal Co. v. Richardson, 156 Ky. 617.

In Stuart's Admr. v. N., C. & St. L. Ry. Co., 146 Ky. 127, the court said:

"Where it is sought to recover damages for negligence or wrongful act, there must be some evidence to show that the deceased lost his life through the negligence of the defendant, and this evidence must be sufficient to charge the defendant with a breach of duty. A recovery cannot be had on mere surmises or speculation as to how the injury that is complained of happened, nor will it be presumed that the defendant was guilty of actionable negligence. If the injury may as reasonably be attributed to a cause that will excuse the defendant as to a cause that will subject it to liability, then the well-settled rule is that a recovery cannot be had." To the same effect are Hurt v. L. & N. R. R. Co., 116 Ky. 545; Early v. L., H. & St. L. Ry. Co., 115 Ky. 13.

In Hughes v. Cincinnati, etc., R. Co., 91 Ky. 526, the court, in speaking of the cause that produced the death of Hughes, said: "We are left to theorize as to it. One suing to recover damages for injury arising from another's neglect must offer some testimony conducing to show that it was so occasioned. Negligence cannot be presumed in a case like this one. The presumption is the other way. It cannot be found without evidence. The complaining party must not only show the injury, but also some evidence tending to show that the other party is to blame for it. Mere proof of the injury, with attending circumstances showing that the party charged with neglect may be blameless, or may be at fault, will not do. In such a case, there is no evidence tending to show that the injury was due to neglect. Circumstances are merely presented upon which one may theorize as to the cause of the accident. The burden of showing neglect rests upon the complainant, and under such circumstances he has offered no evidence tending to show it. He has merely presented two or more states of case upon which one may theorize as to the cause of the accident."

In Gayle's Admr. v. L. & N. R. R. Co., 163 Ky. 459, it appears from the opinion that Gayle came to his death by falling from a passenger train. A recovery was sought by his administrator upon the ground that he was thrown from the train by an unusual and unnecessary jerk, and the court said:

"We shall assume for the purposes of this case that the evidence as to the character of the jerk was sufficient to take the case to the jury. This is not all, however, that plaintiff was required to establish. It was necessary not only to show negligence, but negligence that was the proximate cause of decedent's death. It was, therefore, necessary for plaintiff to prove that the jerk or jerks testified to by the witnesses caused the decedent to fall or be thrown from the train. None of the witnesses was able to say that decedent fell or was thrown from the train at the time the jerks occurred. They testified that the jerks occurred just before the train reached Worthville. Exactly at what point is left in doubt. These jerks occurred some time after crossing the bridge, and before the train stopped. For aught that appears in the testimony, it may have been due to the fact that the steam was shut off just after crossing the bridge. As this was more than half a mile from the station, it is certain that these jerks did not cause decedent to fall from the train. On the other hand, if the jerks took place just as the train was being stopped at the station, it is equally true that they did not cause the injury. It will be seen, therefore, that the cause of the injury, so far as affected by the evidence of plaintiff, is a matter of speculation or conjecture. There was a failure to establish any causal connection between the injury and the jerk. All that the jury could do was to guess at the cause of the accident. Even if we eliminate from our consideration the evidence of the conductor, it is just as probable under the evidence that the decedent jumped from the train before it reached the station as it is that he was thrown from the train by reason of a jerk. Where there is a failure to show that the negligence relied on was the proximate cause of the injury, defendant's liability cannot be made a matter of mere guesswork. In such a case there is nothing to submit to the jury."

Under the facts of this case, when considered in the light of the law applicable, it is perfectly plain that it would be the purest kind of guesswork to say that the

death of Henry Perkins was caused by the injuries he received. Having this view of the case, our opinion is that the court should have instructed the jury to return a verdict for the railway company.

Wherefore, the judgment is reversed, with directions for a new trial, and if there be a new trial, and the evidence is substantially the same as appears in this record, the court will take the case from the jury.