Straus National Bank and Trust Company, Administrator of the Estate of Joseph N. O'Neil, Deceased, Appellee, v. Irving Marcus, Appellant.

Gen. No. 36,898.

Heard in the second division of this court for the first district at the June term, 1933. Opinion filed May 1, 1934.

JOHN A. BLOOMINGSTON, for appellant.

McKENNA, HARRIS & SCHNEIDER, for appellee; JAMES J. McKENNA and ABRAHAM W. BRUSSELL, of counsel.

Mr. Justice Gridley delivered the opinion of the court.

By this appeal defendant seeks to reverse a judgment for $4,500, rendered against him after verdict on April 22, 1933, in an action for damages for negligently causing the death of plaintiff's intestate, Joseph N. O'Neil.

The action was commenced on July 27, 1931. Plaintiff's original declaration, to which defendant filed a plea of the general issue, consisted of six counts. On February 7, 1933, during the trial, plaintiff, by leave of court, filed six additional counts. On the same day plaintiff withdrew from the jury's consideration the 2nd, 4th, 5th and 6th counts of the original declaration, and also the 2nd, 4th, 5th and 6th additional counts. To the 1st and 3rd additional counts defendant filed a plea of the general issue, and also a plea that the causes of action in said counts mentioned "did not, nor did any or either of them, accrue to the plaintiff at any time within one year next before the filing of said counts." The court sustained plaintiff's general demurrer to said plea of the statute of limitations and the case went to the jury on the 1st and 3rd original counts and the 1st and 3rd additional counts. On February 8, 1933, the jury returned a verdict, finding defendant guilty and assessing plaintiff's damages at $4,500.

The 1st original count may be described as a general negligence count. It alleges in substance that on January 30, 1931, defendant was driving his automobile on Michigan boulevard, Chicago, in a southerly direction and approaching 26th street; that at the same time plaintiff's intestate, exercising due care for his own safety, was driving another automobile on Michigan boulevard "in a *northerly* direction, up and to its intersection with said 26th street, and he continued to drive the automobile, *turning* from said Michigan

boulevard into said 26th street in a *westerly* direction"; that defendant, in violation of his duty, so carelessly and negligently operated his automobile that it was permitted to collide with the automobile in which plaintiff's intestate was riding; and that thereby the intestate was thrown to the pavement and so greatly injured that, after languishing for a time, he died on March 19, 1931, as a result of the injuries. The count also contained the usual allegations as to the bringing of the suit within a year from the death, the surviving widow and next of kin, the proffer of letters of administration, etc.

The allegations of the 1st additional count are the same with the exception of the one as to the *direction* in which the intestate's automobile was traveling, which is that said intestate, exercising due care for his own safety, was driving his automobile, "on, along and through the said intersection of said 26th street with said Michigan boulevard in an *easterly* direction, on, along and through said intersection." The allegations of the 3rd original count are substantially the same as those in the 1st original count except that the negligence charged is that defendant drove his automobile at an unlawful and dangerous rate of speed, etc. The allegations of the 3rd additional count are the same as those of the 3rd original count with the exception that the *direction,* in which said intestate's automobile was traveling, is the same as stated in the 1st additional count.

On the trial four eyewitnesses to the accident testified for plaintiff, viz., Frank A. Countryman (the crossing policeman); John C. Muzzo and Ray LaPorte (seated in an automobile, facing west, on 26th street, east of Michigan boulevard); and John Goodman (standing at the southwest corner of the intersection). Plaintiff also called as witnesses two physicians, Drs. Stimson and Needham, who after the accident from

time to time attended and treated the intestate, and two other physicians, Drs. Adams and Swift, who testified as experts. Margery O'Neil, widow of intestate, and one other witness also gave testimony. Defendant's principal witnesses were W. H. Briese, an eyewitness to the accident; John A. Philpott, who subsequently made repairs on the car in which the intestate had been riding; and Dr. Tannenbaum, one of the internes at the Michael Reese hospital to which the intestate was taken immediately after the accident.

On January 30, 1931, the intestate was an employee of the Dashiel Motor Co., working in its service department at the northwest corner of Michigan boulevard and 26th street, Chicago. His home was at 940 Washington boulevard, Oak Park, where he had lived with his wife for about seven years. He was 28 years old, in excellent health, and had normal hearing and eyesight. The accident occurred shortly before 4 o'clock on the afternoon of January 30, 1931, within the intersection of the two streets. Michigan boulevard runs north and south and 26th street east and west. Near to or within the intersection were located several traffic signals, consisting of red, green and yellow lights. Red means that traffic should come to a complete stop; green means to go; and yellow is a cautionary signal,—meaning that vehicles that are standing should get ready to go, and those that are moving should get ready to stop. The testimony of plaintiff's witnesses, Countryman, Muzzo and LaPorte, was to the effect that while the lights showed "green" for traffic on the boulevard and "red" for traffic on 26th street, the intestate was sitting in a standing Dodge car on 26th street, *facing east,* waiting for the lights to change; that when they did change (i. e., to "green" for 26th street traffic and "red" for traffic on the boulevard) the intestate started his car and moved slowly in a northeasterly direction for the pur-

pose of making a left-hand turn to the north on the boulevard; that while he was in the act of doing this, defendant's LaSalle car, moving south on the boulevard at a speed of more than 35 miles an hour, suddenly and without any slackening of speed, "crashed" the lights, entered the intersection, ran into the intestate's car, and caused it to violently come in contact with a pole standing at the southwest corner of the intersection; and that by reason thereof the intestate was thrown out of his car, head first, striking the sidewalk or pavement with his head and right shoulder, and rendering him temporarily unconscious. The testimony of plaintiff's witness, Goodman, and defendant's witness, Briese, was similar, *except* that the intestate's car had been standing south of the intersection, facing north on the east side of the boulevard, and waiting to turn and move *westerly* in 26th street, and that subsequently, while his car was moving *westerly* within the intersection, the collision occurred. Goodman testified: "The fact is, the accident I saw was where a LaSalle car going south and a Dodge car headed *west* came together; the front of the LaSalle and the back or the side of the Dodge car came together." Briese testified:

"I was standing on the southwest corner of 26th and Michigan, waiting for the lights to change to cross Michigan, and the north and south-bound traffic was traveling. . . . There was a Dodge car, with 'Dashiel Motor Company' across the side of it, and the other was a LaSalle car. . . . This Dashiel Co. car made a left turn going *west* on 26th street and collided with the LaSalle car, which was going south. Before the Dodge car made the turn it was going north. When it made the turn the LaSalle car was coming pretty close to 26th street. There is a safety island there and the Dodge car was hugging it and all of a sudden shot around quickly. At this time the lights were on north

and south. . . . When the collision occurred the LaSalle car struck the *right rear* of the Dodge car and hurled it right around in the street. . . . When the Dodge stopped coming sideways it hit the curb, and there was a light pole there, and the Dodge kind of careened a bit, and the door flew open; and a young man came out backward, head first, that is, part way out. . . . When the collision took place the LaSalle was about half way between where the safety island would be and the west curb of the boulevard. . . . At the time the Dodge was struck it was just as it had turned and was about half way across the south drive. The Dodge was not going slowly. . . . I didn't notice how fast it went when it made the turn. . . . I was waiting on the corner for the lights to turn and *really didn't notice the Dodge very much until the two cars came together.* . . . I helped lift the young man off the street, and took him out and brought him over until the Yellow cab came along. He was a young, fresh, fine looking young fellow. . . . He was not looking very healthy then; he was unconscious."

The intestate was conveyed in a cab to the hospital several blocks away, accompanied by plaintiff's witnesses, Countryman and Goodman. During the ride it was observed that he was bleeding from his *left* ear and that blood and white fluid coming from the ear was staining his smock or coat. About the time he arrived at the hospital he regained consciousness and after reaching the examining room he put his finger into his *right* ear and began shaking his head and also began to rave. After being laid out on a table his face and head were washed and his blood pressure taken, etc. While on the table he jumped off and attempted to kiss an attending nurse. He also attempted to use the telephone. After being put to bed and upon further examination by Dr. Stimson it was noticed that the pupils of his eyes were greatly dilated, that his pulse was about 100, that his blood pressure was very high for

his age, and that there was some bluish discoloration around the right temporal and parietal region, an acute tenderness and sprain of the right shoulder joint and some muscular spasms in the back. He complained of headaches, dizziness, etc. He was treated by Dr. Stimson, and given morphine to relieve his pain. In a few days his condition improved and he was permitted to be taken to his home on February 5th. Thereafter, commencing on February 7th, he from time to time received treatments at Dr. Stimson's office. His pulse and blood pressure remained high. He had a swaying walk and apparently was very weak. The treatments on alternate days consisted of the application of heat lamps followed by massage. On February 19th, while at home he had a severe nose-bleed and Dr. Needham was called and there treated him, but the hemorrhages continued and were found difficult to control. Thereafter he was taken to the Oak Park Hospital and Dr. Riordan was called in consultation. Finally, the hemorrhages ceased, but only after the intestate had lost "about one quarter of his total blood," and thereby was in a much weakened condition. After he was returned to his home the heat and massage treatments were resumed at intervals at Dr. Stimson's office, commencing about February 27th. Early in March he made a call at the place where he had worked (Dashiel Motor Co.) but it was found he was too weak to do any work and he was sent home. On March 7th, he was again examined by Dr. Stimson in his office. He had recovered somewhat from the pain in his shoulder and had good motion in the arms, but his pulse and blood pressure still were high and he complained of headaches, dizziness and a feeling of weakness. On that day he also received the usual heat and massage treatment, but on his way home was caught in a blizzard, and upon reaching home had a chill, complained of pain in the left side of his chest and was put to bed. On

March 9th, Dr. Stimson called upon and treated him. He found increased pain in the chest, a high pulse and temperature and diagnosed the symptoms as those of acute pleurisy. Dr. Stimson continued to call on him and treat him daily until March 14th, when Dr. Needham was called in consultation. At this time symptoms of lobar pneumonia had developed and he was taken to the Oak Park Hospital again. He there died on March 19, 1931. Dr. Stimson testified in part:

"We put him in the hospital because he had signs of dullness in the left lung, evidently lobar pneumonia, involving the lower and upper lobes, with rapid breathing. . . . He developed a typical left lobar pneumonia, his pleurisy symptoms subsided and he began having a resolution of the pneumonia on the 18th. A resolution means softening of the exudate and expulsion of it by coughing a lot of preliquid sputum. . . . I didn't see him the last day. Dr. Needham was there when he died. . . . I found he had pneumonia of the left side of the chest. The infectious type of pneumonia is a specific disease coming from a specific organism,—a pneumococcus germ. There are other types, but this was the type I found. . . . *We are exposed to the germs that cause pneumonia all the time.* . . . He had a regular lobar pneumonia. It came about 5 or 6 weeks after the accident. I wouldn't say that the developments of the head and shoulder had cleared up. I wouldn't say they were getting better all the time. . . . As far as the head was concerned he was still having headaches and dizziness and still had nose bleeds. . . . This very bad day that he came down to my office I gave him heat treatments. He might have gotten himself sweated a bit and then gone out a little too soon and gotten cold. . . . That would cause a pneumonia very easily. . . . If a man is *in a generally weakened condition he is much more susceptible to pneumonia.* . . . I would say, speak-

ing medically, that a common cold is often accelerated or started by a change in temperature, like a chilling. For a cold to develop into pneumonia is rather uncommon. Sometimes, however, pneumonia follows a cold, and one of the nicest ways to get a cold is to get a perspiration and then go outside.''

Dr. Needham testified in part:

''I first saw Mr. O'Neil at his home on February 19, 1931, and treated him. He had a severe nasal hemorrhage. . . . Afterwards we took him to the Oak Park Hospital to see if we could see where the blood came from and control it. He had lost considerable blood. The first time he probably *lost a pint,* and then he had two or three hemorrhages in the hospital. . . . I was not able to determine the cause of the nosebleed from my examinations. . . . The cause of his death was acute lobar pneumonia. Of course, the heart gave out. The heart has to pump blood through a congested lung, . . . and after a while the heart gets exhausted and has to quit; there is nothing unusual about it. . . . When I saw him on March 14th, he had a typical lobar pneumonia. . . . *It might follow injury.* It was not the hypostatic type, it was purely an infectious condition. I wouldn't say it was caused by a cold, but by being infected with the pneumococcus germ. . . . A person with a lowered vitality, loss of blood or anything that reduces vitality, *is more susceptible to any infectious disease, including pneumonia.* . . . The pneumonia germ is always present in everybody's mouth.''

Dr. Adams, one of plaintiff's expert witnesses, in answer to a hypothetical question which embodied in substance the facts as above outlined, testified that he had an opinion ''as to whether or not there might or could be, with a reasonable degree of medical certainty, a causal connection between the accident described in said question, occurring on January 30th,

and the death, occurring on March 19th, 1931,'' and stated that, in his opinion, ''there might or could be, with reasonable medical certainty, a causal relation between the accident and the subsequent condition of ill-being and death'' of the man mentioned in the hypothetical question. And the witness in giving reasons for his opinion said: ''It would seem to me that the loss of blood, and the subsequent exposure of the man leaving the office and getting out in a blizzard and taking a chill, ending in pneumonia, would be ample explanation of the cause of the pneumonia, and his weakened condition appears to me would be the result of his accident.'' Dr. Swift, plaintiff's other expert witness, in answer to a similar hypothetical question, expressed a similar opinion. Defendant did not call any expert witnesses, and the expert testimony of Drs. Adams and Swift is without contradiction in the present record.

At the close of all the evidence defendant moved for a directed verdict in his favor but the motion was denied. Defendant also moved that the court instruct the jury ''to disregard the testimony of Muzzo, LaPorte and Countryman, as to the manner in which the alleged collision occurred between decedent's car and defendant's car, on the ground that there was a variance between the allegations of the declaration and such proof; that the allegations of the declaration charge that decedent's automobile was being driven in a northerly direction and turned *west* on 26th street, whereas the testimony of said three witnesses was that decedent's automobile was being driven in an *easterly* direction at the time of the collision.'' This motion also was denied.

In urging a reversal of the judgment, the main contention of defendant's counsel is that the automobile accident ''was not the proximate cause of the death of plaintiff's intestate.'' And counsel argue (1) that ''the pneumonia was an intervening and independent

cause''; (2) that the accident was only the ''remote'' cause; and (3) that ''the question of proximate cause was for the court.''

There are numerous decisions by our Supreme Court in which the principles or rules as to proximate cause have been stated. (See *Pullman Palace Car Co. v. Laack*, 143 Ill. 242, 260, 261; *Siegel, Cooper & Co. v. Trcka*, 218 Ill. 559, 562, 563; *Seith v. Commonwealth Electric Co.*, 241 Ill. 252, 259, 260; *Hartnett v. Boston Store*, 265 Ill. 331, 334; *Fisher v. Chicago, R. I. & P. R. Co.*, 290 Ill. 49, 58; *Maskaliunas v. Chicago & W. I. R. Co.*, 318 Ill. 142, 148; *Phillabaum v. Lake Erie & W. R. Co.*, 315 Ill. 131, 136.) And it is well settled that what is the proximate cause of an injury to a person, or of his death, is ordinarily a question to be determined by the jury under the instructions of the court. (*Landgraf v. Kuh*, 188 Ill. 484, 501; *City of Mt. Carmel v. Howell*, 137 Ill. 91, 93; *Schultz v. Ericsson Co.*, 264 Ill. 156, 157; *Milwaukee & St. P. Ry. Co. v. Kellogg*, 94 U. S. 469, 474.) In the last cited case it is said: ''It is not a question of science or of legal knowledge. It is to be determined as a fact, in view of the circumstances of fact attending it.'' In the *Howell* case it is said: ''Whether the deceased died from spinal meningitis, or from an injury received in the street, as alleged in the declaration, was a question of fact for the jury, and they were told in plain terms, by defendant's 13th and 14th instructions, that plaintiff could not recover unless it was shown, by a preponderance of the evidence, that the injury received in the street was the proximate cause of her death, . . .'' In the *Schultz* case it is said: ''What is the proximate cause of an injury is ordinarily a question of fact for the jury, to be determined from a consideration of all of the attending facts and circumstances. It only becomes a question of law when the facts are not only not disputed, but are also such that there can be no difference in the judgment of reasonable men in the

inference to be drawn therefrom." In an exhaustive annotation in 79 Am. Law Reports, Ann., headed "Injury as proximate cause of death where disease intervenes," it is said at page 351: "It may be generally stated that an injury is held to be the proximate cause of death where disease intervened, when it is shown that the injury caused the disease from which death resulted; *or,* if the injury did not cause the disease, that it *concurred* with the disease as a direct agent in producing death, and without which death would not then have resulted; provided, in either case, there was no intervening act or neglect of the decedent or a third person which contributed to the fatal result." And at pages 361–363, the author refers in detail to numerous cases, decided in jurisdictions other than Illinois, where after the injury and before the death pneumonia developed. Opposing counsel have not directed our attention to any decisions of our Supreme Court, in a case arising under our "Injuries" statute as is the present, where after the injury and before the death pneumonia developed. But plaintiff's counsel have cited several such decisions, which we consider pertinent, arising under our Workmen's Compensation Act, viz.: *Bergstrom v. Industrial Commission,* 286 Ill. 29, 31; *Lumaghi Coal Co. v. Industrial Commission,* 305 Ill. 475, 476; *Kivish v. Industrial Commission,* 312 Ill. 311, 317. In the *Bergstrom* case it appears that on September 26, 1916, George Shaw, while working for his employer as a sheet-metal worker, received a serious injury to his ankle and was taken to a hospital, where, on October 14th, he was operated upon and a bone removed. About four weeks later he was removed to his home and, after the wound from the operation had healed, he was able to move about the house on crutches and was allowed by his attending physician to go out of doors when the weather was pleasant. His foot was kept in a cast for some time and, due to

some cause, an ulcer on the ball of the foot developed and a pimple on the outside of the leg formed, from which a small amount of pus was discharged, and a short time before his death a large abscess came on the back of his neck. On March 2, 1917, he took an automobile ride from about 3 to 6 o'clock, p. m., when the temperature was about 30 degrees. About 9 o'clock the following morning, after having had breakfast in bed and having made no complaints about feeling ill, he called his wife and said he wanted to spit. While she was assisting him to rise, his head fell over on her shoulder and he died. There was no struggle or shudder. On the post mortem examination thereafter had the coroner's physician found the right lung congested and edematous and hypostatic pneumonia in the left lung; also the heart slightly enlarged; the liver slightly congested; and the spleen enlarged, soft and pulpy, indicating sepsis. And said physician expressed the opinion that Shaw "came to his death from hypostatic pneumonia, associated with injuries to his foot," and that "he died of general sepsis,—one of the main factors causing the condition of hypostatic pneumonia." His widow made application for an award under the Workmen's Compensation Act. On the hearing before an arbitrator her claim was denied. On review before the commission, on the same evidence and some additional evidence, that body made an award in favor of the claimant, which was reviewed and affirmed by the circuit court of Cook county. The case reached the Supreme Court by writ of error, where the award was "resisted on the ground that the death did not result from an accident arising out of and in the course of the employment." In affirming the judgment the Supreme Court said (p. 31):

"It is insisted by plaintiff in error that the injury to the foot had no connection with the death; that the conditions which caused the death were the direct re-

sult of the exposure from the automobile ride. Shaw wore no overcoat during the ride. He had on flannel underwear, his limb was wrapped in flannel and he was wrapped to the armpits in a heavy lap-robe. Several physicians testified, most of them as experts. . . . They did not all agree, and the opinions expressed by some of them tend to support the contention of plaintiff in error. Others expressed the opinion that death resulted from the continued septic process and that the ride in the automobile had nothing to do with it. We cannot weigh the evidence. If there is any competent testimony fairly tending to support the claim of defendant in error, we cannot consider the weight of the evidence and reverse the judgment because in our opinion it is contrary to the preponderance of the testimony. . . . There was competent testimony to support the claim of defendant in error that the death resulted from an accident arising out of and in the course of the employment.''

In the *Lumaghi Coal Co.* case, *supra,* our Supreme Court affirmed a judgment of the circuit court of Madison county, which had confirmed an award of the Industrial Commission made in favor of the dependents of the deceased employee, saying in part (305 Ill., pp. 475, 476; italics ours):

''January 19, 1920, John Buckner was crushed between a car and a prop in the mine of the Lumaghi Coal Co. and suffered a complete fracture of the fourth rib on the right side, a serious fracture of the sternum, an incomplete fracture of the right ilium and bruises on his back and chest. He was taken to a hospital, where he was treated until February 8, when he was moved to his home. Pneumonia developed the next day, and with this disease he lingered until March 9, when he died. He was confined to his bed continuously from the time he was injured until he died. The attending physicians testified that the injuries he re-

ceived were not serious *and in themselves would not have produced death.* It was their opinion that the injuries *weakened his disease-resisting powers* and in that respect *contributed to his death.* They were, of course, not able to state whether he would have contracted pneumonia if he had not been injured or whether he would have died from the disease if he had been in good physical condition when he contracted it. Buckner *was in good health prior to the accident,* . . . We have examined all of the evidence in the record and are convinced that the finding is right. . . . The judgment is affirmed.''

In the *Kivish* case, *supra,* it appears that the circuit court of Saline county had confirmed a decision of the Industrial Commission *denying* an award to the plaintiffs in error for damages arising out of the death of Alex. Kivish, an employee of the Harrisburg Colliery Co., who, on April 11, 1919, was seriously injured by the fall of some coal in the company's mine, and who while thereafter in a hospital contracted influenza and there died of pneumonia on February 7, 1920; and that on review on writ of error our Supreme Court reversed the judgment of the circuit court and remanded the cause with directions to enter judgment in favor of plaintiffs in error ''for the amount justified by law.'' In the opinion the court said in part (312 Ill. pp. 316–318):

. ''Notwithstanding the learning and skill of the physicians attending Kivish at the time of his death, it is not possible to determine definitely and absolutely whether the injuries received by him were the proximate cause of his death. . . . It is not uncommon for pneumonia to develop in a person who has suffered a serious injury to the thorax, and when a healthy man, crushed and bruised as Kivish was, develops pneumonia while confined to his bed by reason of his injuries and dies before the injuries to his chest have

healed, it is natural and reasonable to conclude that his ·death is the result of such injuries. . . . No man knows whether Kivish would have died if he had not contracted influenza. Perhaps this disease further weakened the patient's powers of resistance, but whether the pneumonia developed because of the injuries or because of the influenza, or the patient succumbed to pneumonia because of his weakened condition due to the injuries, or to influenza, is not capable of demonstration. . . . The whole record considered, we are convinced that the death of Kivish was caused by the injuries received by him while in the employ of defendant in error. . . ."

Among the adjudicated cases in other jurisdictions, where actions were brought to recover damages for negligently causing the death of a person injured in an accident and prior to the death pneumonia developed and damages were adjudged following a verdict of a jury, reference is made to the following: *Beauchamp v. Saginaw Mining Co.*, 50 Mich. 163, 174; *Illinois Cent. R. Co. v. Harris* (Miss.), 29 So. 760; *Sharp v. Missouri Pacific R. Co.*, 213 Mo. 517, 531; *Kuenzel v. City of St. Louis*, 278 Mo. 277, 281; *Beckner v. Kansas City Rys. Co.* (Mo. App.), 232 S. W. 745, 747; *Nicoll v. Sweet*, 163 Iowa 683, 685; *Sterling Anthracite Coal Co. v. Strope*, 130 Ark. 435, 437; *Marks v. Reissinger*, 35 Cal. App. 44, 59; *Thompson v. Seattle, R. & S. R. Co.*, 71 Wash. 436, 440; *Louisville & N. R. Co. v. Jones*, 83 Ala. 376, 382. In these cases there were holdings to the effect that it was a question for the jury to determine from all the evidence whether the injuries received by the deceased proximately caused or contributed to his death. In the *Beauchamp* case (50 Mich. 174), it is said:

"Is it clear beyond dispute, that the cold taken, pneumonia and death were independent and separate from the injury received and sickness resulting therefrom? Can it be said with judicial certainty that the

injury, the sickness and weakness following therefrom, did not directly cause or largely contribute to the attack of pneumonia, and that the party wrongfully injured was as able to withstand this resultant attack as he would have been if 'a good, healthy, well-nourished boy' as at the time he received the injury? If the injury received and sickness following therefrom concurred in and contributed to the attack of pneumonia, the defendant must be held responsible therefor. It cannot be said that here was a second wrongful act, or a disease, wholly independent of the first wrong, which caused the death of the boy.''

In *Ensign v. Southern Pac. Co.,* 193 Cal. 311, plaintiff's intestate was badly injured in his back in 1914 while loading heavy pipes in defendant's railroad car, which was jarred by the impact of certain other cars against it. After being in bed for a time he became able to walk a little with the aid of a cane, though he had a decided limp. His weight, however, so steadily decreased that in July, 1918, when he died, he weighed about 60 pounds less than when injured. He developed a rectal abscess and his condition required an operation, which while being performed resulted fatally. A jury returned a verdict and assessed damages against defendant for negligently causing the death. It was contended in the reviewing court that plaintiff had failed to prove that the injury was the proximate cause of the death and that the jury's verdict rested on mere conjecture and speculation. In deciding adversely to the contention the court said (p. 318):

''The jury were justified under the evidence hereinabove set out in arriving at the conclusion, as they evidently did, that the back of the deceased was wrenched; that as a consequence he suffered pain with attendant loss of sleep which resulted in a lowering of his vitality; that by reason of his weakened power. of resistance he became the prey of tuberculosis; that as a result a rectal abscess, tubercular in origin, de-

veloped, which necessitated an operation which resulted fatally. In other words, the jury found, and were justified in finding, that the ultimate result could be traced through successive stages to the original injury, and that the responsibility rested upon the one who put in operation the chain of events which resulted in the death of the deceased.

"It was not necessary for the plaintiff, in order to recover, to show that the tuberculosis was traumatic in origin. If, on account of the depleted and weakened condition of a person caused by an injury, he is rendered more susceptible to germs than if he had not been injured, or if, because of his debilitated condition, he is unable to resist the attack of germs present in his system, then the disease resulting from the germs is a natural sequence to his condition resulting from the injury, and the injury is the proximate cause of his death, and the disease is but one of the links in the chain of causation."

Defendant's counsel refers in his brief to certain somewhat similar cases in which the ultimate decision was in favor of the defendant. Among those cases are *Mayor and City Council of Nashville v. Reese,* 138 Tenn. 471; *Seifter v. Brooklyn Heights R. Co.,* 169 N. Y. 254; *Cincinnati, N. O. & T. P. R. Co. v. Perkins,* 177 Ky. 88; but an examination of them discloses that they are to be distinguished in their facts from those appearing in the present record and from those in the cases above referred to.

We are of the opinion, after considering all of the evidence in the present case, including the testimony of O'Neil's attending physicians and that of the medical experts introduced by plaintiff, and after a careful review of the authorities, that the main contention and argument of defendant's counsel, above mentioned, are without merit.

Another contention of defendant's counsel is in substance that the court erred in allowing plaintiff during

the trial to file the 1st and 3rd additional counts to his declaration, and in sustaining plaintiff's demurrer to defendant's plea of the statute of limitations to said additional counts. In our opinion said additional counts did not state a new cause of action. (*Chicago City Ry. Co. v. McMeen,* 206 Ill. 108, 115, 117, 118; *Carlin v. City of Chicago,* 262 Ill. 564, 572, 573; *Bandet v. Burns,* 266 Ill. App. 382, 384.) Furthermore, we think that under section 39 of our former Practice Act, in force when the present action was commenced and when the judgment appealed from was entered, said additional counts would relate back to the date of the filing of plaintiff's original declaration. (*Bandet v. Burns, supra; Zister v. Pollack,* 262 Ill. App. 170, 179–182.)

Defendant's counsel also contends that the court committed reversible error in the giving to the jury of certain instructions offered by plaintiff. We have reviewed the instructions complained of and considered counsel's arguments relative thereto, and are of the opinion, in view of all of the given instructions and the evidence, that the jury were fully and fairly instructed and that counsel's contention is lacking in substantial merit. (See *Beard v. Maxwell,* 113 Ill. 440, 442; *Funk v. Babbitt,* 156 Ill. 408, 415, 416; *Reivitz v. Chicago Rapid Transit Co.,* 327 Ill. 207, 213.) And we do not think that the court committed reversible error in refusing to give to the jury a certain instruction offered by defendant, as is also urged.

And we find no merit in counsel's further contentions (a) that "the evidence does not support the verdict" and (b) that "the manifest weight of the evidence is in favor of defendant."

Our conclusion is that the judgment appealed from should be affirmed, and it is so ordered.

*Affirmed.*

SULLIVAN, P. J., and SCANLAN, J., concur.