### Premier Motors v. Smith's Adm'x.

Feb. 15, 1944.

Davis, Boehl, Viser & Marcus for appellant.

Jones, Keith & Jones for appellee.

OPINION OF THE COURT BY JUDGE RATLIFF—Affirming.

This appeal is from a judgment of $5,500 rendered in favor of appellee, administratrix, against appellant, a corporation, in an action to recover for the alleged wrongful death of Creed D. Smith. Appellee, plaintiff, alleged in her petition, in substance, that on October 20, 1941, her decedent, Creed D. Smith, was an employee of the appellant, defendant, and was engaged as an automobile salesman; that on or about October 20, 1941, while her decedent, Smith, was employed in the establishment of the defendant known as the Used Car Department, located at 1428 West Broadway, Louisville, Kentucky, Smith being then and there engaged in opening the office and preparing the same for the day's business, through the negligence and carelessness of defendant, its agents, servants and employees, in failing to provide a safe place for Smith to work and perform his labors, an electric clock hung upon the wall of defendant's office by its agents, servants and employees, and in the room where Smith was performing his labor, was caused to fall and strike Smith upon the head and caused him to contract erysipelas from which injury and disease he died on November 6, 1941.

The answer consisted of traverse and a plea of contributory negligence, the latter being traversed by reply. Later by amended petitions, the plaintiff further pleaded that the place provided by the defendant for Smith to work was unsafe and dangerous, which was unknown to Smith but was known to the defendant, or by the exercise of ordinary care could have been known in time to have remedied the defect. The amended petitions were denied, thus completing the issues. Various alleged reasons are assigned and argued in brief of appellant for reversal of the judgment, the principal one being that the evidence is insufficient to show that the alleged negligent injury complained of was the proximate cause of Smith's death.

It appears that appellant had constructed a small office building which it moved from place to place to suit the convenience of its business. The building was constructed of beaverboard nailed to wood uprights, or two-by-fours, and according to the evidence of some of the witnesses the clock which fell and struck Smith was fastened or nailed to the beaverboard and, according to the evidence of certain witnesses for appellant, there were two hooks by which the clock was supposed to have been hung but it was hung on one hook only.

Bob Dulin, a colored porter who was an employee of appellant, was the only eyewitness to the accident. He testified that on the morning of the accident he was cleaning the office and Smith entered the office, pushing the door open, and when he shoved the door back against the wall the electric clock fell and struck him on the head, knocking him down. He helped Smith up and asked him if he was hurt but he could not tell him for awhile. He said that he did not examine Smith's head except by putting his hand on top of his head where he felt a knot. Smith worked until about 3:30 or 4 o'clock on that day but did not return to work the next day but came back on the second day and worked about a week or ten days. The witness was asked what happened then and he said "he just got worse and worse," kept complaining with his head and was not feeling good and his head and neck commenced swelling and after a week or ten days he was sent home. He described the clock as being about "a foot or more square—four cornered clock." He said after the clock fell he put it back on the wall. He was asked what held the clock, and he answered: "A nail—Had a nail in it—beaverboard wall. I imagine that is why it come out so quick—beaverboard. Q. Tell the jury what was beneath the clock, if anything? A. Something underneath it—a little strip of wood, about an eighth of an inch thick, held one edge up—kind of balanced it, and a nail at the top." He was asked what caused the clock to fall, and he answered: "The door—when he opened the door and hit the wall." In answer to a question as to the condition of the nail he said the nail was bent and looked like it had been out before, and that somebody had "pushed" it up there. He said he put the clock up again and moved it higher and drove the nail into the wood on the wall.

Luke Bolton, another witness for the appellee, testi-

fied that he was familiar with the building in which the accident occurred and described it as being constructed of beaverboard "tacked over two-by-fours, tacked up like that." He was asked if it was ordinary beaverboard and he said he could not say whether it was or not; "it is that stuff that you line the interior of a building with. I am not a building material man; I would not know. It is the usual stuff that you line the interior or an outbuilding with." Gilbert K. Dyer, testifying for appellee, stated that he was building manager of the Kentucky Home Life building and in the course of his business he had supervision over the changing around and rebuilding and redecorating of the offices, including the building of partitions, covering walls, etc. He said that there were different kinds of beaverboard and after describing them he was asked to tell the jury whether or not it is safe to drive nails into beaverboard, and he answered: "There is nothing to hold a nail in beaverboard. It has no strength. It was not designed for that purpose. It is just as strong as the framework behind it. You can run your hand through any of it, except the real hard pressed masonite." He was then asked to tell the jury whether or not in his opinion it would be safe to hang an electric clock such as the one shown in the present case and weighing approximately three pounds, by one nail driven into beaverboard, and he answered: "I don't think so. It has no strength whatever." Carl E. Salsberry, manager of the Republic building at Fifth and Walnut Streets in Louisville, consisting of eleven floors, testified as to his experience in building materials and knowledge of beaverboard and said that it would not be safe to hang a clock of the weight of the one involved in this case by driving one nail in a beaverboard wall. It is obvious from the foregoing that the evidence was sufficient to take the case to the jury on the question of whether or not there was negligence on the part of appellant in having the clock nailed or fastened to a beaverboard wall as described in the evidence.

The appellee, widow of the deceased, testified that on the day the accident occurred, Smith came home at about 4 p. m. but that he usually came home at about 9 p. m. She was asked to describe his condition and she said he had a knot and a gash cut on the top of his head and was complaining of his head. She bathed his head in salts water and alcohol but no doctor was called

for several days. She further described the wound on his head as a small V-shaped cut about three-quarters of an inch deep. However, according to the evidence of other witnesses the V-shaped wound was three-quarters of an inch long, rather than deep. Apparently, when the witness used the word "deep" she evidently had reference to the length of the wound. She said it had the appearance of a cut that would be made by a heavy object falling or striking him on the head. Smith stayed home on the following day but returned to work on the next day, Wednesday morning. She said that the swelling of his head and face began a few days after he was injured but he worked several days until his condition became such that his employer told him to go home and called her and told her to have a doctor and that she called Dr. Neely and he said that Smith had erysipelas. She said that when Dr. Neely saw him "he was not himself; he did not know anything" and did not become conscious any more and died on November 6. She said his face was swollen, his eyes swollen together, his left eye completely closed, and the swelling went down into his neck. This was about twelve days after the accident occurred. She said that previous to the injury complained of Smith was in good physical condition and in perfect health so far as she knew and had never had a doctor because he was never sick until this happened.

Irene Wooldridge, a married daughter of Smith, testified that she was at her father's home on the day of the accident and that he came home on that day in the early afternoon although his usual hours of work were from 7 in the morning until 9 at night. She said that when he came home she and her mother examined his head and he had a knot and a cut place on it. She was asked if she recalled when the swelling started on his face and neck and she said that it started to swell on the night of the day he was hurt; "You could see it starting all down this way—came down the left side of his face." Ruth Feireisel, another married daughter of Smith, testified that she was at her father's home when he came home on the day he was injured and she saw a bump and a V-shaped cut on top of his head and that the prongs of the "V" were about three-quarters of an inch each way. She said his head and eyes started swelling "right after that happened; * * * then when he went to work the next morning, it was swollen—was be-

ginning to swell then, and each day it got worse—his head began to get bigger.''

Dr. Paul C. Neely testified that he was first called to see Smith on November 3, 1941, and he was very sick with an erysipelas infection of his face. He said that he obtained no history of the case from him at that time other than that he had been sick for several days; that his face and forehead were swollen to quite a great degree; ''his eyes were almost swollen shut, very red and inflamed—characteristic of erysipelas.'' He said he prescribed sulfapyridin, one of the sulfa drugs, and he seemed to improve for a few hours and then became worse and on the evening of the third day he sent him to the hospital and he died in the early morning of November 6. He said that he learned later that decedent had had an injury to his head a few days before he saw him. He was asked to tell the jury whether or not the injury to decedent's head as described by Mrs. Smith could have resulted in his contracting the erysipelas which caused his death, and he answered: ''It could have—yes, sir.'' In answer to questions on cross-examination Dr. Neely said he was familiar with the period of incubation of the erysipelas germ and the time would vary from one day to three weeks; that erysipelas is a form of streptococcus infection and there are different types, the traumatic type which results from trauma, and the idiopathic type, the cause of which is not known. He was asked what type Smith had and he said if he had an injury it would be the traumatic type and if he had no injury it would be the idiopathic type; that the traumatic type is usually fatal but the idiopathic type is not usually fatal. The witness further stated that he did not see any cut or injury to Smith's head at the time he examined him. He said that he did not know that traumatic erysipelas brought about Smith's death, but he died from erysipelas, whether traumatic or idiopathic.

Dr. Charles W. Jefferson testified as an expert, basing his answers upon a hypothetical question based upon the evidence of Mrs. Smith and Dr. Neely, and was asked to state whether or not in his opinion the injury received by Smith on October 20 as described by the witnesses was the proximate cause of his death. The witness first discussed the cause of erysipelas and described its nature and possible causes and sources of inception and concluded his answer by saying: ''I would

think if the man had the abrasion and developed erysipelas and died, I would think he died from the erysipelas.'' He was further asked and answered as follows :-

Q. I want you to tell the jury whether or not under those conditions the patient—assuming that he had that cut on his head—under those conditions, whether or not the erysipelas came from the cut on his head or from the infection that got into the cut on his head? A. You see, I suppose there were streptococcic germs on the clock or they got in in some way. The man had an abrasion. If he got it abraded and got a streptococcic bug in some place else afterwards, the primary cause would be the abrasion, no matter where the infection came from afterwards. It would have to get the germ into the wound before he would get it.''

On cross-examination he was asked and answered as follows :

''Q. Also, the clock may have made an abrasion, and yet no germ entered the skin at that time, and some period of days or weeks may have passed, but sometime prior to the absolute healing of that abrasion, the germ may have gotten in there from some other source? A. It got in there some way. You have to have an abrasion.''

Dr. Frank P. Strickler also testified as an expert, basing his answers upon a hypothetical question, and was asked to state his opinion as to whether or not the accident or injury to Smith's head was the proximate cause of his death. In answering the question the doctor first stated matters which were hardly responsive to the question, but concluded his answer in this language: ''The hypothetical question sounds perfectly plausible to me, that the man could and did die as a result of the injury where the bacteria gained entrance, and he had no treatment at all of the thing until Doctor Neely saw him, and it had progressed so far it was hopeless.'' Two or three other lay witnesses testified for appellee but their evidence does not give much light on the question with respect to the cause of Smith's death. One of the witnesses stated that sometime between the date of the injury and the date of Smith's death he saw Smith and noticed a wound or sore on his head. Others testified that he was in good health so far as they observed prior to the accident.

Dr. E. L. Henderson testified as an expert witness for the appellant. He stated that the streptococcus germ enters a little abrasion and causes a swelling at the site of entry, but that it is difficult to say where the germ actually enters; that the period of incubation is from a few hours to an outside limit of seven or eight days, and is more usually from two to three days. Dr. Henderson further stated that in his opinion the striking of Smith on the head by the clock could not have had anything to do with his death from erysipelas because the period of incubation of the erysipelas germ is much shorter than the time which passed between the accident and the infection. Apparently Dr. Henderson based his answer upon the theory that the infection developed several days after the accident. Dr. Neely, the only doctor who saw Smith before his death, said he saw him about November 3 or about twelve days after the accident, and found his condition as described in his evidence, but he had no way of knowing when the infection developed or the time of the incubation of the erysipelas germ. According to the evidence of Mrs. Smith and the two daughters, the swelling started in his head, face and neck soon after his injury. One of the daughters stated that it began swelling the same night and the other one noticed the swelling on the second or third day, or the day when he went back to work. Also, Bob Dulin stated that Smith's head and face were swelling and that he was complaining of his head from the time he went back to work on the second day after the injury until his condition became so bad that his boss sent him home. According to the evidence of these witnesses it is apparent that the incubation or infection set in within from one to three days after the injury. All the doctors who testified in the case are in agreement that the time of incubation of the erysipelas germ will vary from twenty-four hours to three days or seven or eight days, and one of them fixed the maximum time even much longer. Also, Dr. William J. Coyle and Dr. Heman Humphrey testified as experts for appellant, and according to their evidence the time of incubation of the erysipelas germ is only about seven days. If it be conceded that the doctors who testified for appellee and those who testified for appellant differ in some respects, it only presents a conflict of evidence, which was a question for the jury.

Appellant cites the cases of Cincinnati, New Orleans & Texas Pacific Railway Co. v. Perkins' Adm'r, 177 Ky. 88, 197 S. W. 526; and Thomas' Adm'r v. Eminence Distilling Co., et al., 151 Ky. 29, 151 S. W. 47. However, the facts involved in those cases are not the same as presented in the present case. Appellant insists that the cause of Smith's death, that is, whether the erysipelas germ was caused by trauma brought about by the clock falling on him, is mere speculation and guess and therefore insufficient to take the case to the jury. We are cited to no Kentucky case where the facts are analogous to the present case. Appellee cites the case of Boggess v. Kansas City R. R. Co., 207 Mo. App. 1, 229 S. W. 404, and the Kentucky case of Tanner v. Sanders, 247 Ky. 90, 56 S. W. (2d) 718. There are many elements in common between those cases and the present one, however they are not in point as to the precise facts involved.

Another point raised by appellant is that there was no notice to appellant, actual or constructive, of the unsafe condition of the place where Smith was working and for that reason appellant was entitled to a directed verdict. Appellant insists that it was the duty of appellee to both allege and prove that appellant either knew or could have known of the unsafe condition complained of, citing Idol v. L. & N. Railroad Co., 203 Ky. 81, 261 S. W. 878. In the petition and petition as amended it is alleged that appellant did know of the unsafe condition, or could have known the same by the exercise of ordinary care, and, as we have already stated, we think the proof is sufficient to take the case to the jury on the question of negligence, thus meeting the requirements argued for by appellant.

It is next insisted that the court erred in overruling appellant's motion to permit the jury to go to the building and view or examine it. The motion was objected to by appellee upon the ground that the conditions were not the same. Appellant insists that although the building had been moved it was in the same condition as it was when the accident occurred. It must not be forgotten that the accident arose out of the manner in which the clock was fastened to the wall, and even though the building itself was in the same condition, according to the evidence of Bob Dulin, and it is undisputed, after the clock fell and struck Smith he, Dulin,

put the clock back up on the wall in a different location and drove the nail into the wood, or two-by-four, to which the beaverboard was tacked. Since the condition or manner of fastening the clock to the wall was not the same as it was when it fell on Smith, the court properly refused to permit the jury to view the premises.

The next complaint is directed to the alleged misconduct of appellee's counsel. It appears that application was made before the Workmen's Compensation Board and some evidence taken before the compensation board commissioner. It was developed, however, that Smith had not signed the compensation register and the claim was dismissed. On the voir dire examination of the jurors appellee's counsel asked if any of the jurors were employers of a considerable number of men, more than three (meaning the statutory number required to operate under the Workmen's Compensation Act, KRS 342.005 et seq.). When asked by opposing counsel what he was referring to, he said: "The Compensation Act." Appellant objected and moved the court to discharge the jury but the court refused to discharge the jury. When the witness Bob Dulin was being questioned concerning testimony he had given before the compensation board, which was prior to the trial of this action, appellee's counsel announced that they would stipulate such testimony as was taken before the Workmen's Compensation Board commissioner. This was objected to and motion to discharge the jury made which was also overruled. The argument is that these references to the compensation board tended to convey to the jury the impression that the damage suit was brought because no compensation had been received and tended to inflame the minds of the jury, inducing them to arrive at a larger verdict. If the references to the compensation board had had any influence on the jury, it might be argued with equal plausibility that it impressed the jury with the idea that compensation had been refused by one tribunal, the compensation board, upon the merits of the case, which might have been prejudicial to appellee rather than to appellant. In R. B. Tyler Company v. Cantrell, 281 Ky. 718, 137 S. W. (2d) 401, an action by an injured employee who had not signed the compensation register, but who was procured to sign it after he was injured and while in the hospital, together with an agreement for compensation, the statement of his attorney to the jury as to the benefits

652

he would have received under the Compensation Act by the proposed settlement, was held improper but not prejudicial. It may be conceded that the references to the compensation board here complained of were improper, yet we do not think they were prejudicial. We find no error prejudicial to the substantial rights of appellant.

Judgment affirmed.